Linda HARP, Appellant/Cross–Appellee,

v.

ARCO ALASKA, INC. and ALPAC/CIG-
NA/INA, Appellees/Cross–Appel-
lants.

Nos. S–4400, S–4437.

Supreme Court of Alaska.

May 1, 1992.

Chancy Croft, Anchorage, for appellant, cross-appellee.

Timothy A. McKeever and Theresa Hennemann, Faulkner, Banfield, Doogan & Holmes, Anchorage, for appellees, cross-appellants.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

## I. INTRODUCTION

Linda Harp appeals a ruling by the Alaska Workers' Compensation Board that ARCO Alaska, Inc. and ALPAC/CIGNA/INA (collectively "the employer") need not pay Harp a penalty pursuant to AS 23.30.155 for controverting her claim to temporary total disability ("TTD") benefits. Harp argues that a penalty is appropriate because the employer controverted her claim in bad faith. The employer cross-appeals the Board's ruling that Harp is entitled to TTD benefits. The employer argues that Harp is not disabled, and that even if she is disabled, her disability is not work-related.

## II. FACTS AND PROCEEDINGS

Linda Harp worked for the employer as a security specialist in the atrium of its Anchorage office building. She suffered from thoracic outlet syndrome[1] since at least 1982. In June 1987, she underwent surgery to relieve her symptoms. Doctor Edward Berkeley performed the surgery.

Following the surgery, Harp returned to work. As part of her job as a security specialist, she took a CPR class on July 29, 1987. During the class she was required to use both arms to compress the chest cavity of a mannequin used to test CPR technique. Harp experienced pain in her right shoulder on the day after the class. This pain later became severe. Due to her injury, Harp stopped working approximately three weeks after the CPR class.

The employer paid Harp TTD benefits from August 24, 1987 until June 11, 1988. In June 1988, the employer controverted payment of any future benefits and contended that benefits paid after February 9, 1988 represented an overpayment. The employer stated in the controversion notice that it was controverting her claim because she had provided "no medical verification of ongoing disability," and because the "[w]ork incident of 7–29–87 was only a temporary aggravation of long-standing pre-existing non-work related cervical problems."

After the controversion, Harp filed an application for adjustment of her claim with the Alaska Workers' Compensation Board.[2] Harp requested, *inter alia*, TTD benefits and a penalty pursuant to former AS 23.30.155(e).[3] The employer disputed

---

1. The thoracic outlet is a triangular-shaped opening beneath the collar bone above the first rib. Thoracic outlet syndrome arises when the brachial plexus nerve and the subclavian artery become compressed in the thoracic outlet due to lack of sufficient space. The neurological symptoms of thoracic outlet syndrome include numbness, tingling, and weakness in the hands. The vascular symptoms (Raynaud's phenomenon) of thoracic outlet syndrome include poor circulation to the fingers with blanching, numbness, and vasoconstriction.

2. In an earlier Decision and Order, the Board directed the employer to reimburse Harp for the reasonable travel expenses she incurred as a result of her treatment by Dr. Berkeley. *Harp v. ARCO Alaska, Inc.,* AWCB No. 88–0252 (September 29, 1988).

3. Former AS 23.30.155 provided in relevant part:

(a) Compensation under this chapter shall be paid periodically, promptly, and directly to the person entitled to it, without an award, except where liability to pay compensation is controverted by the employer....

. . . .

(e) If any installment of compensation payable without an award is not paid within seven days after it becomes due, as provided in (b) of this section, there shall be added to the unpaid installment an amount equal to 20 percent of it, which shall be paid at the same time as, and in addition to, the installment, unless notice is filed under (d) of this section or unless the nonpayment is excused by the board after a showing by the employer that owing to conditions over which he had no

all of Harp's claims. It argued that Harp's disability was not work-related and that an order to pay benefits was therefore inappropriate.

The Board relied upon the opinions of several medical experts. The most important evidence came from Dr. Berkeley, Harp's treating physician, and Dr. Charles Brantigan, a thoracic surgeon who examined Harp in November 1988 at the employer's request.

Doctor Berkeley testified that, although it is not mentioned in his operative notes, he removed portions of Harp's scalene muscles during her surgery. After the surgery, he prescribed medication for pain due to the surgery. Harp called him a few days after the operation and told him her thoracic outlet syndrome symptoms had totally subsided. She also complained about hypersensitivity in the area of the surgical incision. He released her to return to work the following week with restrictions on reaching, pulling, pushing, and carrying. On August 11, 1987, Harp called him to report the CPR incident and the recurrence of neck and shoulder pain and tingling in her fingers. Dr. Berkeley testified that, in his opinion, the CPR incident could have caused Harp some permanent damage. He also stated that Harp could return to work after the CPR incident, as long as the same restrictions on her work applied.

Doctor Brantigan testified in his deposition that "compelling evidence" supported the diagnosis of thoracic outlet syndrome, and that Harp was completely disabled from meaningful work. He disagreed, however, with Dr. Berkeley's conclusion that the CPR class was to blame. If the CPR training had resulted in damage to the surgical site, he stated, Harp would have noticed symptoms immediately rather than one or two days later. Unaware of Dr. Berkeley's testimony that he had severed Harp's scalene muscles, Dr. Brantigan concluded from Dr. Berkeley's operation notes that Harp's condition was attributable to a natural reattachment of the scalene mus-

cles to the brachial plexus nerves. When scalene muscles are divided but not removed in surgeries to relieve thoracic outlet syndrome, he testified, the muscles reattach to the nerve roots directly or by scar tissue "50–60% of the time," often resulting in recurring symptoms. He testified that the CPR activity conceivably caused a muscle spasm which caused the scalene muscle reattachment to become evident through thoracic outlet syndrome symptoms, but that the CPR activity itself probably had no meaningful relationship to Harp's current condition. Doctor Brantigan also testified that Harp's prescriptions for pain-killing medication were inconsistent with Dr. Berkeley's opinion that the employee was asymptomatic after the surgery.

In its Decision and Order dated February 10, 1989, the Board ordered payment of past, and reinstatement of future, TTD benefits as requested by Harp. The Board refused to order payment of a penalty, however, holding that the employer's reliance upon Dr. Brantigan's report was a sufficient basis for the controversion. This conclusion was erroneous, for Dr. Brantigan did not examine Harp until November 1988, several months after the controversion.

Harp appealed the Board's decision to the superior court, arguing that the Board erred in denying her claim for a penalty and in denying her claim for additional attorney's fees. The employer cross-appealed, arguing *inter alia* that the Board erred in concluding that Harp was temporarily totally disabled. The employer then petitioned the Board to reconsider certain aspects of its Decision and Order which are not at issue in this case. Harp moved for a partial remand to the Board and petitioned the Board to modify its Decision and Order to award Harp additional attorney's fees and a penalty pursuant to former AS 23.-30.155. The superior court remanded the case to the Board to consider Harp's motion for modification of the Board's order

control the installment could not be paid within the period prescribed for the payment.

The 1988 amendments to subsection (e) of this statute, which became effective July 1, 1988, substituted "25 percent" for "20 percent."

regarding the penalty and additional attorney's fees.

Upon remand, the Board denied Harp's petition for modification of its Decision and Order. The Board conceded that it had erred in concluding that the employer had controverted the claim in reliance on Dr. Brantigan's report. It ruled that a penalty was inappropriate, however, stating that an employee's failure to provide medical verification of a continuing disability is a valid basis for controversion. The Board also refused to award additional attorney's fees to Harp's counsel.

Harp appealed the Board's decision to the superior court, alleging that the Board erred in denying her claims for a penalty and for additional attorney's fees. The employer cross-appealed, claiming that the Board erred in concluding that Harp was temporarily totally disabled. Because the record did not contain a transcript of the Board's proceedings, the parties stipulated to the accuracy of the representations in the briefs concerning testimony before the Board.

Judge Milton Souter affirmed the Board's Decision and Order. He denied Harp's claim for a penalty, holding that the Board's finding that the employer had not acted in bad faith justified the Board's decision not to penalize the employer.[4] He rejected the employer's cross-appeal, concluding that the testimony of Dr. Berkeley sufficiently supported the Board's decision that Harp was temporarily totally disabled.

## III. DISCUSSION

### A. DID THE BOARD ERR IN HOLDING THAT HARP WAS ENTITLED TO TEMPORARY TOTAL DISABILITY BENEFITS?

The Board ordered the employer to pay Harp continuing TTD benefits from the date of controversion, as well as the costs of reasonable and necessary medical treatment of Harp's thoracic outlet syndrome. The employer argues that this decision should be reversed because it is based upon an erroneous standard of law and is not supported by substantial evidence.

### 1. Did the Board apply the correct legal standard?

In a proceeding for the enforcement of a workers' compensation claim, it is presumed that the claim is compensable in the absence of substantial evidence to the contrary. Former AS 23.30.120(a)(1). In *Burgess Constr. Co. v. Smallwood*, 623 P.2d 312, 316 (Alaska 1981), we held that for the presumption of compensability to apply to an employee's claim, the employee must establish a preliminary link between the injury and continuing symptoms. When a preliminary link is established, it becomes incumbent upon the employer to come forward with substantial evidence to rebut the presumption. *Resler v. Universal Serv., Inc.*, 778 P.2d 1146, 1149 (Alaska 1989). To overcome the presumption of compensability, the employer must present substantial evidence that the injury was not work-related. *Id.* We have "consistently defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Miller v. ITT Arctic Serv.*, 577 P.2d 1044, 1046 (Alaska 1978). If the presumption of compensability is successfully rebutted, the employee must then prove all of the elements of the case by a preponderance of the evidence. *Id.* The employer argues that while the Board discussed the presumption of compensability, it failed to actually apply the presumption, or any part of the legally-required analysis, in reaching its conclusion that Harp had a TTD. Specifically, the employer claims that the Board failed to determine whether Harp established a preliminary link between her employment and her physical impairment, whether the employer rebutted the presumption of compensability, and whether Harp proved her case by a preponderance of the evidence. Because the Board applied the incorrect legal standard, the em-

---

**4.** The Board did not actually examine whether the employer acted in bad faith. The Board did not require a penalty because it felt that Harp's failure to provide medical verification of a continuing disability was a valid basis for controversion.

ployer argues, the superior court's order should be vacated.[5]

■ We agree that the Board failed to explicitly apply the proper legal analysis. The Board simply ruled that, based on the evidence presented at the hearing, Harp's work "aggravated her preexisting thoracic outlet syndrome condition and was a substantial factor in bringing about her current disability." We believe, however, that the Board's failure to explicitly state that Harp was entitled to the presumption of compensability was a harmless error. Because the Board articulated the correct legal standard, and then concluded that Harp should be compensated because her work aggravated her preexisting injury and was a substantial factor in bringing about her current disability, no doubt can exist that the Board applied the proper legal analysis. *See Kodiak Oilfield Haulers v. Adams*, 777 P.2d 1145, 1150–51 (Alaska 1989) (holding that the Board's failure to apply the statutory presumption of compensability was harmless since the employer had presented sufficient evidence to rebut the presumption). We note, however, that the conclusory findings of the Board made our review of the Board's decision quite difficult. In future cases involving the presumption of compensability, the Board should explicitly state whether the employee established a preliminary link between her employment and her physical impairment, whether the employer rebutted the presumption of compensability, and if so, whether the employee proved her case by a preponderance of the evidence.

## 2. *Was the Board's decision supported by substantial evidence?*

The employer next contends that the record does not support the Board's conclusion that Harp was physically unable to work after February 1988 due to a work-related disability. This court must affirm the Board's findings of fact if substantial evidence supports those findings. *Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 593 n. 8 (Alaska 1979). "Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a given conclusion." *Id.*

### a. Does substantial evidence support the Board's finding that Harp was disabled after February 1988?

Alaska Statute 23.30.265(10) defines disability as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." The employer argues that, since Dr. Berkeley testified that Harp could return to work as long as certain restrictions were placed on her activities, she is not "disabled" for purposes of the Act.

■ The record indicates that the employer failed to preserve the issue of Harp's disability for review by this court. While the employer's controversion notice states that there was "[n]o medical verification of ongoing disability," the employer did not argue that Harp was not disabled in its briefs to the Board. Because the record does not contain a transcript of the January 12, 1989 hearing before the Board, it is impossible to ascertain whether the employer questioned Harp's disability during the hearing.[6] The Board's February 10, 1989 decision suggests, however, that the employer did not question Harp's disability during the hearing. That decision states that "[t]he basis for the employer's position is that the employee's current disability is not work-related." Because the employer did not argue before the Board that Harp was not disabled, the employer is precluded from raising this issue on appeal.

■ Even if the employer had not waived the issue of whether Harp was disabled, we would not reverse the Board's decision to award TTD benefits. With the

---

5. The employer's arguments that the Board misapplied the applicable law raise questions of law, which this court reviews *de novo. Simon v. Alaska Wood Products*, 633 P.2d 252, 254 (Alaska 1981).

6. The parties stipulated before Judge Souter to the accuracy of the representations in the briefs concerning testimony before the Board, but that stipulation does not seem to pertain to the parties' *arguments* before the Board.

exception of the testimony of Dr. Berkeley, no medical testimony suggests that Harp is not disabled.[7] Doctor Brantigan, the medical expert hired by the employer, felt very strongly that Harp was disabled. He testified that Harp's "symptoms are so pronounced that [she] is completely disabled from doing any meaningful work at the present time." Because the medical records and testimony indicate that Harp was disabled, and only Dr. Berkeley's testimony suggests that Harp was not disabled, substantial evidence supports any Board conclusion that Harp was disabled.

b. Does substantial evidence support the Board's finding that Harp's ailments stem from the CPR-training incident?

In its Decision & Order of February 10, 1989, the Board found that Harp aggravated her thoracic outlet syndrome condition during the CPR-training class and that her claim was therefore compensable. The Board examined the medical testimony of Dr. Berkeley and Dr. Brantigan before making this finding. The Board reasoned:

> Dr. Brantigan's belief that naturally occurring muscle reattachment rather than CPR activity caused the current symptoms was based only on Dr. Berkeley's operative notes. Dr. Berkeley testified, under oath, that while he did not mention it in his notes he did in fact remove portions of the scalene muscles. While we have no reason not to believe Dr. Berkeley, we also note that he mentioned removing bands of muscle or ligament in his deposition before Dr. Brantigan focused on the lack of removal in his deposition. We find, therefore, that Dr. Brantigan's thesis is not supported by the facts. We also accept Dr. Berkeley's explanation distinguishing "surgical pain" from the thoracic outlet syndrome symptoms (including head and neck pain) and thereby explaining the apparent conflict between his belief the employee was essentially symptom-free after surgery

even while he (and other physicians) prescribed pain medication.

The employer attacks the Board's determination that Harp aggravated her thoracic outlet syndrome condition during the CPR-training class. The employer claims that that finding was based only on Dr. Berkeley's testimony that he had removed portions of Harp's scalene muscles, and that this testimony does not constitute substantial evidence because it is inconsistent with his previous testimony, the medical records and Dr. Brantigan's unrefuted testimony.

Judge Souter rejected the employer's argument that the Board erred in finding Harp's injury was work-related, holding that the testimony of Dr. Berkeley is "more than ample" to support the Board's determination, and that the Board did not exceed its discretion in resolving minor inconsistencies in Dr. Berkeley's testimony in favor of Harp.

We also reject the employer's argument that Harp's injury was not work-related. Before the Board found that Harp's disability was work-related, it carefully weighed the same arguments which the employer raises in this appeal. These arguments are that Dr. Berkeley's report shows that he simply divided Harp's scalene muscles, and that Harp's symptoms following surgery are consistent with a reattachment of the scalene muscles. The Board expressly considered these issues, reasonably concluding from Dr. Berkeley's testimony that he had resected portions of Harp's scalene muscles. We affirm this conclusion because it is supported by substantial evidence.

B. DID THE BOARD ERR IN FAILING TO IMPOSE A PENALTY ON THE EMPLOYER FOR CONTROVERTING HARP'S CLAIM?

Harp maintains that the employer had no valid reason to controvert her claims to TTD benefits, and that the employer should therefore pay Harp a penalty pursuant to former AS 23.30.155(e). The employer dis-

---

**7.** The fact that Dr. Berkeley testified that Harp could return to work as long as certain restrictions are applied suggests that Harp is not disabled. Some of his medical reports indicate, however, that he believes she is disabled. For example, Dr. Berkeley noted after Harp's December 1987 office visit that Harp had difficulty using her right hand.

agrees, claiming that its stated reasons for filing the notice of controversion evince its good faith, and therefore it should not be penalized.

Alaska Statute 23.30.155 imposes a penalty on an employer who fails to pay an installment due to an employee if the employer does not controvert the employee's right to compensation within 21 days, or within seven days if the employer has previously made compensation payments. The Act does not state whether a controversion notice which is timely filed can under certain circumstances be ineffective to avert a penalty.

■ A controversion notice must be filed in good faith to protect an employer from imposition of a penalty. In *Stafford v. Westchester Fire Ins. Co. of New York,* 526 P.2d 37 (Alaska 1974), this court wrote:

> In circumstances where there is reliance by the insurer on responsible medical opinion or conflicting medical testimony, invocation of penalty provisions is improper. However, when nonpayment results from bad faith reliance on counsel's advice, or mistake of law, the penalty is imposed.

*Id.* at 42. *See also* 3 A. Larson, *Larson's Workmen's Compensation Law* § 83.-41(b)(2) (1990) ("Generally a failure to pay because of a good faith belief that no payment is due will not warrant a penalty."). For a controversion notice to be filed in good faith, the employer must possess sufficient evidence in support of the controversion that, if the claimant does not introduce evidence in opposition to the controversion, the Board would find that the claimant is not entitled to benefits. *See Kerley v. Workmen's Comp. App. Bd.,* 4 Cal.3d 223, 93 Cal.Rptr. 192, 197, 481 P.2d 200, 205 (1971) (the only satisfactory excuse for delay in payment of disability benefits,

whether prior to or subsequent to an award, is genuine doubt from a medical or legal standpoint as to liability for benefits).

■ The evidence which the employer possessed at the time of controversion was, at best, neutral evidence that Harp was not entitled to benefits. As to the first stated reason for the controversion, that Harp failed to provide ongoing verification of her disability, the employer possessed no evidence that Harp was not disabled. Because the Act does not require an employee to provide updates of her medical condition, an employer must not be allowed to unilaterally terminate benefits when an employee fails to provide medical verification of her ongoing disability.[8] *See Colomb v. Frito-Lay, Inc.,* 544 So.2d 710, 715–16 (La.Ct. App.1989) (holding that the defendant employer, who controverted an employee's claim in the absence of any factual information that the employee was not entitled to benefits, must pay a penalty because it did not possess sufficient factual information to reasonably counter the factual information presented by the claimant). The Act expressly allows an employer to require an employee to submit to medical examinations requested by the employer, but the employer in this case did not take advantage of that opportunity.[9] *See* AS 23.30.095(e) ("The employee shall, after an injury, at reasonable times during the continuance of the disability, if requested by the employer or when ordered by the board, submit to an examination by a physician or surgeon of the employer's choice...").

The employer also possessed insufficient evidence as to the second stated reason for controverting Harp's benefits, that her disability was not work-related. The employer points out that when Dr. Berkeley exam-

---

8. Harp argues that because AS 23.30.120 provides a presumption of compensability, an employer which has accepted an employee's claim must continue paying benefits until the employer produces evidence that payments are no longer warranted. The Board has consistently rejected this argument, holding that the presumption applies only to work-relatedness. *See, e.g., Keyes v. Reeve Aleutian Airlines,* AWCB No. 850312 (November 8, 1985).

9. Linda Harp testified that Marlene Sjoberg, ARCO's adjuster, called her in March 1988 and "was going to set up an independent medical consultation for [Harp]." Sjoberg apparently told Harp that she would arrange for the examination and then call Harp back. Sjoberg never called her back.

ined Harp in December 1987, he was "at a loss to understand what [was] going on and why she had recurrent symptoms." This statement alone would not constitute substantial evidence that Harp is not entitled to benefits. Furthermore, it appears from the context of the statement that Dr. Berkeley was referring to the specific internal source of her pain, not to the external event which had aggravated her pain.[10] Finally, because Dr. Berkeley, along with Dr. Fu and Dr. Meinhardt, had previously concluded that Harp's disability was work-related, it is unlikely that Dr. Berkeley was questioning the work-relatedness of her injury in his December 1987 report.

Because neither reason given for the controversion was supported by sufficient evidence to warrant a Board decision that Harp is not entitled to benefits, the controversion was made in bad faith and was therefore invalid. A penalty is therefore required by former AS 23.30.155(e).

## III. CONCLUSION

Because the superior court did not err in ordering the employer to pay Harp continuing TTD benefits from the date of controversion, that aspect of the Board's Decision and Order is AFFIRMED. We REVERSE the Board's decision not to require the employer to pay Harp a penalty, and REMAND the case with instructions to enter judgment accordingly.

---

**10.** Doctor Berkeley's notes state:

I explained to her that I had no simple solution to her problem. I am at a loss to understand really what is going on and why she had recurrent symptoms, some of which might be due to some brachial plexus irritability in the place where we did the previous surgery and decompression in the right thoracic outlet, though she has in addition, some degenerative changes at C4–5.