*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| WILLARD HARRIS, | ) | |
| | ) | Supreme Court Nos. S-14254/14262 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Alaska Workers' Compensation |
| | ) | Appeals Commission No. 09-027 |
| v. | ) | |
| | ) | O P I N I O N |
| M-K RIVERS and ACE | ) | |
| INDEMNITY INSURANCE | ) | No. 6876 – March 14, 2014 |
| COMPANY, | ) | |
| | ) | |
| Appellees and | ) | |
| Cross-Appellants. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission, Laurence Keyes, Commissioner Chair.

Appearances: Mark Choate, Choate Law Firm LLC, Juneau, and J. John Franich, Franich Law Offices LLC, Fairbanks, for Appellant/Cross-Appellee. Robert J. Bredesen, Russell, Wagg, Gabbert & Budzinski, Anchorage, for Appellees/Cross-Appellants.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

I.      INTRODUCTION

After a 1976 work-related motor vehicle accident, the worker was left a paraplegic. He suffered a number of medical complications related to his injuries.

In 2007 his employer controverted some aspects of his medical care, and he filed a written workers' compensation claim. Shortly before the hearing on the claim, the employer withdrew most of its controversions. The Alaska Workers' Compensation Board decided that some of the controversions were frivolous, unfair, or in bad faith. It imposed a statutory penalty and reported its findings about frivolous or unfair controversions to the Alaska Division of Insurance. The employer appealed, and the Alaska Workers' Compensation Appeals Commission reversed the Board in part, deciding as a matter of law that the Board could not impose a penalty for some of the controversions. The Commission decided that other appeal points were moot. The worker appeals the Commission's decision reversing the penalties and some attorney's fees; the employer cross-appeals the Commission's decisions about preservation of the controversion issues and mootness. We affirm in part, reverse in part, and remand to the Commission with instructions to remand to the Board.

## II. FACTS AND PROCEEDINGS

In October 1976 Willard Harris suffered a spinal cord injury in a work-related motor vehicle accident; he has used a wheelchair since the accident. Not long after the accident he developed heterotopic ossification in his hips, which caused them to be "fixed in 35 degrees of flexion."[1] His knees, ankles, and toes are also fixed. Harris is diabetic and suffers from hypertension, chronic bed sores, and sleep apnea. As a result of the spinal cord injury, Harris has difficulty maintaining a correct body temperature. He is subject to many infections, including osteomyelitis, a bone infection that is related to "chronic bacterial growth on his wounds." His care is understandably

---

[1]    Heterotopic ossification is extraskeletal bone formation, usually in muscle or other soft tissue.

complex. Harris lives in the San Francisco Bay area, where he has lived for more than 20 years.

Because of Harris's fused hips, he is unable to transfer as easily as most paraplegics and cannot spend much time in his wheelchair because he cannot be positioned in the same way that other paraplegics can. He has several medical beds. At the time of his deposition in 2008, he had two beds in his home, one for sleeping and one "for daily living skills," in addition to one in his van for use when traveling long distances. The type of bed Harris uses is important to his skin care: Some beds are better able to prevent formation of bed sores and promote their healing, but Harris indicated that no bed is perfect for him. The specialized beds Harris requires are expensive, costing over $50,000.

Harris and his employer, M-K Rivers, have entered into several partial settlements since the accident. In 1998, he and the employer entered into a stipulation in which the employer accepted the compensability of his diabetes. In the stipulation, the employer agreed to pay for 24-hour-a-day attendant care and a personal trainer "if deemed reasonable and necessary pursuant to the Alaska Workers' Compensation Act." The stipulation also said that the employer had "authorized the services of a non-medical fitness facility" and "stipulated and agreed that such care is appropriate, reasonable and necessary pursuant to the Alaska Workers' Compensation Act." The parties agreed that alternative medical treatment, "including Chinese herbs and acupuncture, [was] not in issue" at the time; it was "left open pursuant to the Alaska Workers' Compensation Act."

At some point in the early 2000s, the insurance carrier suggested to Harris that he consider a global settlement of his claim. Harris told the adjuster he would want too much money, but they agreed to have a care planner write a life plan outlining

Harris's future medical care needs.[2] Beginning in 2005 a series of disagreements arose, and the employer set up an employer's independent medical evaluation (EIME) with Dr. Nichole Chitnis in 2006. Dr. Chitnis noted that Harris "has maintained a very positive outlook, in spite of numerous difficult situations in the last 30 years and has taken extremely good care of himself" and "has surrounded himself with good caretakers." She stated that Harris's routine medical care was "appropriately managed" by his various doctors and listed prescription medications Harris was taking, including Vasotec.[3] Dr. Chitnis suggested a few changes to Harris's care: She recommended decreasing the frequency of his acupuncture treatments (for neck pain) and massage therapy (for muscle spasticity); she also thought that Harris did not need to see a nutritionist monthly and that some of the supplements he was taking were not essential to his care. Dr. Chitnis did not give an opinion about any prescription medication or the compensability of Harris's ancillary conditions, such as hypertension, and she said she did "not have enough experience to recommend one bed over the other."

After Dr. Chitnis's report, M-K Rivers controverted the following as not reasonably necessary: nutritional consultant services, many supplements, and a physical therapist assistant for in-home exercises (except for "short periods of time for acute flare ups only"). It also reduced the frequency of covered acupuncture treatments, massage therapy, and personal trainer services. Finally, it controverted payments related to "a temperature controlled environment," asserting that this issue was part of an earlier partial compromise and release agreement.

---

[2] The insurance adjuster testified that the care plan was also used to set reserves.

[3] Vasotec is used to treat hypertension.

About a week after this controversion, one of Harris's physicians prescribed a Clinitron bed for wound care for a three-month trial; the prescription noted that Harris might purchase the bed if it was effective. M-K Rivers controverted the Clinitron bed; the controversion notice said that according to Dr. Chitnis's EIME report Harris's "current bed was strongly recommended by his physicians" and that the employer would "agree to the rental/purchase of the Beriatric bed frame, welding of the trapeze bar, silk long johns as necessary and cushion covers as needed." The controversion notice gave no other reason for denying a Clinitron bed.

A prehearing conference was held in April 2007 regarding the benefits that had been denied in the controversions. According to the employer, it did not have adequate information from Harris's physicians about his needs. Harris's attorney agreed to provide medical information to the employer and file a workers' compensation claim for any benefits the employer still denied.

Harris submitted a letter dated May 17, 2007, and signed by Andrew J. Ross, M.D., one of his treating physicians, setting out "the list of medical prescriptions Willard Harris Jr. will require for the rest of his life." The letter said that the Clinitron bed had "the unanimous approval of at least five doctors that it is medically necessary." It also asked that Harris's diabetes and hypertension medication coverage be reinstated.

On June 1, 2007, Harris filed a workers' compensation claim for "[u]nfair or frivolous controvert" as well as for a number of benefits that had been controverted. M-K Rivers answered and filed another controversion. The controversion and answer both disputed the compensability of Harris's diabetes, hypertension, and sleep apnea. Harris amended his claim at a September 2007 prehearing conference to include the Clinitron bed and the "[n]ature & extent of attendant care." The request for a Clinitron bed was later withdrawn, and a request for an Ortho Hillrom bed was added at a March 2009 prehearing conference.

At some point Harris's condition deteriorated; after his deposition in January 2008, the parties informed the Board they planned to "set up a team of physicians" to evaluate Harris's condition and make recommendations about needed treatment. The parties did not reach an agreement at that time, but after deposing Dr. Yenjean Hwang, Harris's infectious disease doctor, in June 2009, the employer "determined that it would be appropriate to withdraw the controversions" that were based on Dr. Chitnis's report. Several issues remained in dispute, including administrative costs, dentistry related to sleep apnea, transportation, heating and cooling needs, unfair and frivolous controversions, a petition to compel,[4] and attorney's fees.

The Board held a hearing on July 2, 2009. At the beginning of the hearing the chair asked the parties what was still in dispute because he had stepped in at the last minute to preside at the hearing and was not familiar with the record. Harris's attorney said the carrier had withdrawn its controversions of many of the items listed as contested in the prehearing conference memo, but said that "the controversion process has caused injury to Mr. Harris." Harris's attorney later said they would "talk today about how his physical condition has deteriorated . . . since the controversions." When M-K Rivers's attorney listed the remaining issues, he said, "Unfair and frivolous controversion is still at issue."

Harris presented his own testimony and testimony from five witnesses. M-K Rivers presented the testimony of Patricia Mackay, the insurance adjuster. Most of the testimony was related to Harris's medical needs, not the controversions that are the subject of this appeal. M-K Rivers asked the adjuster about a prescription for Vasotec that Harris said had recently been denied:

---

[4]     The petition to compel discovery was related to documentation of Harris's payments to his caregivers.

Q: There was a discussion about the refusal to authorize the hypertension medication?

A: Right.

Q: Did you actually file a controversion or just . . . .

A: No, I just — no. It comes through what — our third-party administrator medication dispenser company for a 'script, and it came through as a new prescription for that medication and was written by Dr. Ross. I had nothing to go on. It said it was for hypertension, and so you can either accept or approve or whatever, and — or deny, and I hit the deny button, because I had nothing to substantiate it.

Harris's attorney also asked the adjuster about the Vasotec prescription:

Q: When you decided recently to not pay the Vasotec prescription — you're aware that Mr. Harris is hypertensive, right?

A: Well, I am now.

Q: Well, you've been paying for hypertension medication for him for 10 years.

A: I don't recall if I have or not. Bazillions of medications come in on him.

Harris also presented copies of receipts for expenses which he claimed were compensable, including some prescription expenses.

The Board decided many issues in favor of Harris, including a ruling that the heating and cooling costs were compensable.[5] The Board found that the adjuster's testimony that she had not controverted the hypertension medication was not credible.

---

[5] The Board denied Harris's request for dental care related to his sleep apnea, most transportation costs, and some "administrative costs."

Using the test set out in *Harp v. ARCO Alaska, Inc.*,[6] the Board decided that some of the controversions were in bad faith because the adjuster did not have adequate evidence in her possession at the time of the controversions to justify them. Specifically, the Board said that the controversion of the Clinitron bed was not in good faith because the adjuster had no evidence on which to base the controversion; the Board assessed a penalty "on the value of a Clinitron bed as of the controversion date." It also determined that the controversion of treatment for diabetes, sleep apnea, and hypertension was in bad faith and therefore unfair and frivolous. The Board said Harris was entitled to a penalty "on the value of . . . any hypertension and sleep apnea treatments due and owing as of the date of its controversion and on any [treatments] not timely paid through the date Employer withdrew its controversion." The Board also ordered that M-K Rivers could not in the future "unilaterally controvert or terminate diabetes treatment and care" or attendance at a non-medical fitness facility; instead, if it wanted to discontinue these treatments in the future, it needed to petition the Board to modify the 1998 stipulation.

M-K Rivers appealed to the Commission, raising a number of issues. The Commission affirmed in part and reversed in part; it also decided that an issue related to the diabetes controversion was moot. It remanded the issue of attorney's fees because it had reversed part of the Board's decision. It affirmed the Board's decisions that occupational therapy, an orthotic device, resistance exercise equipment, and heating and cooling costs were compensable.

The Commission looked at the controversions of the bed and diabetes treatment. M-K Rivers questioned whether the controversions of the Clinitron bed and diabetes treatment were properly before the Board: According to M-K Rivers the prehearing conference summaries "gave no indication" that these controversions were

_____

[6]     831 P.2d 352, 355 (Alaska 1992).

at issue. The Commission determined that the issues were properly before the Board but determined that no penalties were owed. The Commission decided that because the prescription for the bed was never actually filled and the request for the bed was subsequently withdrawn (and another bed substituted for it), no compensation was "owing" under the statute and thus no penalty was due. It likewise reasoned that no penalty was due for the diabetes controversion, even though M-K Rivers admitted that the controversion was a "mistake," because "no bills were presented for payment." Based on its determination that no penalty was due, the Commission decided that the other questions about the controversions were moot.

The Commission also "reverse[d] the board to the extent that its order appeared to erroneously foreclose M-K Rivers from asserting any defense to diabetes treatment and attendance at a non-medical fitness facility without first petitioning for relief from the 1998 stipulation." Its ruling was based on *Summers v. Korobkin Construction*, where we required the Board to decide the compensability of a claim even though no specific benefits were at issue at the time of the hearing request.[7] The Commission remanded the case to the Board for reconsideration of attorney's fees in light of its decision.

Harris appeals the Commission's reversal of (1) penalties for the controversions, (2) the Board's order about future diabetes controversions, and (3) the attorney's fees award. M-K Rivers cross-appeals two issues: (1) whether the Board erred in finding that two controversions were filed in bad faith, unfairly, or frivolously; and (2) whether the Commission erred in not deciding issues related to the controversions, determining instead that the issues were moot.

---

[7]     814 P.2d 1369, 1372-73 (Alaska 1991).

## III. STANDARD OF REVIEW

In an appeal from the Alaska Workers' Compensation Appeals Commission, we review the Commission's decision.[8] We apply our independent judgment to questions of law that do not involve agency expertise.[9] Interpretation of a statute is a question of law to which we apply our independent judgment; we interpret the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.[10] "Determining whether an employer controverted a claim in good faith requires resolving questions of fact."[11] We independently review the Commission's conclusion that substantial evidence in the record supports the Board's factual findings, which "requires us to independently review the record and the Board's factual findings."[12]

## IV. DISCUSSION

### A. The Controversion Issue Was Properly Before The Board.

M-K Rivers argues here that the Board violated its due process rights by finding that it had unfairly or frivolously controverted the prescription for the Clinitron bed and treatment for diabetes, hypertension, and sleep apnea and by assessing a penalty related to these controversions. According to M-K Rivers, "the Board raised these

---

[8] *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010) (citing *Barrington v. Alaska Commc'ns Sys. Grp., Inc.*, 198 P.3d 1122, 1125 (Alaska 2008)).

[9] *Id.*

[10] *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003) (quoting *Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[11] *Bailey v. Tex. Instruments, Inc.*, 111 P.3d 321, 324 (Alaska 2005).

[12] *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

penalty and bad faith controversion claims sua sponte." The Commission decided that the controversion claims had been adequately preserved for the Board hearing.

We agree with the Commission that the issue was properly before the Board, and as a result, we conclude that the Board did not violate M-K Rivers's due process rights. Two controversions were filed before Harris filed his written workers' compensation claim: the controversion that included nutritional supplements and the controversion of the Clinitron bed. When Harris filed a written workers' compensation claim on June 1, 2007, he listed these two controversions in the section of the form entitled "Reason for filing claim." "Unfair & frivolous controversion" is listed as an issue in all of the prehearing conference summaries. Nothing in the prehearing conference summaries indicated that the request for a finding of unfair or frivolous controversion on any controversion was withdrawn, even though the request for the bed itself had been withdrawn. The Commission correctly recognized that a claim for unfair or frivolous controversion of a benefit is an issue distinct from the benefit itself, even though the issues can be related.

Additionally, Harris listed the controversions in his prehearing memorandum before the Board, and M-K Rivers's attorney told the Board that "[u]nfair and frivolous controversion is still at issue" when the Board chair inquired at the beginning of the hearing. M-K Rivers included an argument about unfair or frivolous controversion in its closing brief, arguing that the adjuster had properly relied on the EIME opinion when filing controversions. None of these arguments excluded the Clinitron bed or treatment for diabetes, sleep apnea, and hypertension from the claim for unfair and frivolous controversion. We therefore conclude that the Board did not violate M-K Rivers's due process rights when it considered and made findings about all of the controversions.

**B. The Commission Erred In Holding As A Matter Of Law That No Penalty Was Due.**

Relying on AS 23.30.155(e),[13] the Board imposed a penalty on the value of the Clinitron bed as of the date of the prescription and also imposed penalties on "any hypertension and sleep apnea treatments due and owing as of the date of its controversion and on any not timely paid through the date [M-K Rivers] withdrew its controversion." It also imposed a penalty on any unpaid diabetes treatments pursuant to AS 23.30.155(f), which governs penalties related to Board-ordered benefits. The Commission reversed the Board's order with respect to the penalties on two different grounds. First, the Commission said that no medical bills for Harris's diabetes, hypertension, or sleep apnea treatment were "presented for payment and not paid" so that no penalty could be imposed even though M-K Rivers had acknowledged that the controversion for these conditions was "a mistake." The Commission also decided that penalties could not be imposed on the value of the Clinitron bed because there was no "compensation owing, much less a late payment."

Harris appeals the Commission's decision reversing the penalty awards, arguing that we should apply the policy rationale used in *Childs v. Copper Valley*

---

[13]     AS 23.30.155(e) provides:

> If any installment of compensation payable without an award is not paid within seven days after it becomes due, . . . there shall be added to the unpaid installment an amount equal to 25 percent of the installment. This additional amount shall be paid at the same time as, and in addition to, the installment, unless [a controversion] notice is filed . . . or unless the nonpayment is excused by the board . . . .

*Electric Association*[14] and hold that penalties can be imposed when an employer lacks a good faith basis to controvert prescribed medical treatment even if no bill has yet been presented for payment. He contends that the controversion of the bed prevented him from getting needed medical care, particularly in light of its high cost: He argues that few workers' compensation recipients can afford "a bed costing tens of thousands of dollars."

We decided in *Harp v. ARCO Alaska, Inc.* that "[a] controversion notice must be filed in good faith to protect an employer from imposition of a penalty."[15] We set out an objective standard to determine an employer's good faith: "For a controversion notice to be filed in good faith, the employer must possess sufficient evidence in support of the controversion that, if the claimant does not introduce evidence in opposition to the controversion, the Board would find that the claimant is not entitled to benefits."[16] In *Harp*, we examined the reasons the employer gave in the controversion notice for contesting benefits and the evidence it had in support of these reasons; we held that the employer did not have enough evidence in its possession when it controverted benefits to avoid a penalty because the evidence it had was "at best, neutral evidence" that the employee was not entitled to benefits.[17] *Harp* does not require an inquiry into

---

[14]    860 P.2d 1184, 1192 (Alaska 1993).

[15]    831 P.2d 352, 358 (Alaska 1992).

[16]    *Id.* (citing *Kerley v. Workmen's Comp. Appeals Bd.*, 481 P.2d 200, 205 (Cal. 1971)).

[17]    *Id.*

the motives of the controversion's author.[18] We have never overruled *Harp*, and it is still the law.

In *Childs v. Copper Valley Electric Association* we interpreted the workers' compensation statute to include medical benefits in those benefits that are subject to a penalty under AS 23.30.155(e).[19] We decided that giving the insurer "an incentive" to pay medical bills promptly weighed in favor of construing the act to include medical benefits in the definition of "compensation" that can be subject to a penalty.[20]

We have also held that "a controversion that does not delay payment, even if made in bad faith, does not provide the basis for a penalty."[21] In *Sumner v. Eagle Nest Hotel* the employer filed a controversion of a lump-sum permanent partial impairment (PPI) payment on August 9, but then paid the claim on August 21 after receiving clarification about the rating of the impairment.[22] The Board decided that the August 21 payment was timely and did not make a finding about whether the controversion was made in good faith.[23] Sumner argued that "bad faith warrants the imposition of a penalty

---

[18]   In its decision in this case, the Commission stated that a penalty is due when a controversion is filed in bad faith or is frivolous or unfair, and that a bad faith controversion "lacks *any* legal basis" or is "*designed* to mislead or deceive the employee." (Emphasis in original.)

[19]   860 P.2d 1184, 1192 (Alaska 1993).

[20]   *Id.*

[21]   *Sumner v. Eagle Nest Hotel*, 894 P.2d 628, 631 (Alaska 1995).

[22]   *Id.* at 629.

[23]   *Id.* at 630.

regardless of the promptness of payment"; we rejected his argument because there was no delay in payment.[24]

Alaska Statute 23.30.155(e) requires imposition of a penalty when compensation is not paid within seven days after it becomes "due." Installments of compensation must be paid on a schedule set out in the statute.[25] We must determine when medical care becomes "due" such that an employer may be subject to a penalty when its controversion was not filed in good faith under *Harp*.

We interpret statutes according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.[26] A penalty provision has been part of the workers' compensation statute since 1959.[27] There is no statutory definition of "due" in either the Alaska Workers' Compensation Act or AS 01.10.060, so the term is construed according to its common meaning.[28] *Webster's Dictionary* defines "due" first as "[p]ayable immediately or on demand" and then as "[o]wed as a debt: OWING."[29] *Black's Law Dictionary* has two similar, relevant meanings: "[i]mmediately enforceable <payment is due on delivery>" and "[o]wing or payable; constituting a debt <the tax refund is due from the IRS>."[30]

---

[24]     *Id.* at 632.

[25]     AS 23.30.155(b).

[26]     *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003) (quoting *Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[27]     Ch. 193, § 13(5)-(6), SLA 1959.

[28]     AS 01.10.040(a).

[29]     WEBSTER'S II NEW COLLEGE DICTIONARY 356 (3d ed. 2005).

[30]     BLACK'S LAW DICTIONARY 574 (9th ed. 2009).

The Commission's interpretation appears to use the second meaning because it interpreted the statute to require presentation of a bill; its discussion also uses the word "owing." The Board's interpretation is closer to the first meaning of "due" because it assessed a penalty on the value of the bed as of the date of the controversion, implying that the bed should have been available to Harris then.

The Alaska Workers' Compensation Act sets up a system in which payments are made without need of Board intervention unless a dispute arises.[31] If the employer disputes payment, it is required to file a timely controversion notice.[32] The purpose of the act is "to ensure the quick, efficient, fair, and predictable delivery of indemnity and *medical benefits* to injured workers at a reasonable cost to the employers . . . subject to [it]."[33] The workers' compensation system also recognizes that it is appropriate to require an employer, who gets the benefit of protection from tort liability by participating in the system,[34] to bear the cost of a worker's injury, rather than impose that cost on the general public.[35] Under this compensation system, payments "due" under the act are more appropriately characterized as "[p]ayable immediately or on demand," not "[o]wed as a debt."[36]

---

[31]     AS 23.30.155(a).

[32]     AS 23.30.155(d).

[33]     AS 23.30.001(1) (emphasis added).

[34]     *See* AS 23.30.055 (providing that workers' compensation is the exclusive remedy unless employer does not "secure payment of compensation").

[35]     *See Wright v. Action Vending Co.*, 544 P.2d 82, 86-87 (Alaska 1975) (quoting 1 ARTHUR LARSON, WORKMEN'S COMP. LAW § 2.20 (1972)) (describing purpose of workers' compensation laws).

[36]     *See* WEBSTER'S, *supra* note 29, at 356.

We have previously recognized the importance of medical care in workers' compensation cases. In *Summers v. Korobkin Construction*, we held that "an injured worker who has been receiving medical treatment should have the right to a prospective determination of compensability,"[37] noting that "[i]njured workers must weigh many variables before deciding whether to pursue a certain course of medical treatment or related procedures. A salient factor in many cases will be whether the indicated treatment is compensable under [the act]."[38] We later construed the penalty provision in AS 23.30.155 as including medical benefits because the threat of a penalty gives the insurer "an incentive" to pay medical bills promptly.[39] The same policy consideration applies here. Without the possibility of a penalty, an insurer would be able to controvert expensive medical care for no reason and escape without sanction, even when the care is critical to an employee's health.

Our construction of the statute as permitting imposition of a penalty on a medical benefit that has been prescribed but not yet paid is supported by our prior decisions, caselaw from other states, and the Board's regulation interpreting another statutory subsection. In *Hammer v. City of Fairbanks*, we considered imposition of a penalty and held that PPI became due when the employer received a rating from the employee's doctor.[40] Because the employer only wrote a letter to the doctor seeking clarification of the rating, but did not file a notice of controversion or pay within the time

---

[37]    814 P.2d 1369, 1372 (Alaska 1991).

[38]    *Id.*

[39]    *Childs v. Copper Valley Elec. Ass'n*, 860 P.2d 1184, 1192 (Alaska 1993).

[40]    953 P.2d 500, 506 (Alaska 1998).

required, we held that the employer had to pay a penalty on the PPI amount.[41] Analogously, medical benefits become due for purposes of controversion and penalties when the employer has notice they have been prescribed by a doctor. Additionally, a controversion of medical benefits that is not made in good faith delays receipt of a benefit. In our view, *Sumner*'s holding supports imposition of a penalty when a controversion delays medical care that is reasonable and necessary.[42]

When the Board finds that an employer has unfairly or frivolously controverted "compensation due," AS 23.30.155(o) says that the Director of the Division of Workers' Compensation must notify the Division of Insurance. In its regulations, the Board has interpreted "compensation due" in AS 23.30.155(o) to mean "the benefits *sought* by the employee, including . . . medical . . . benefits . . . *whether paid or unpaid* at the time the controversion was filed."[43] Although we do not decide here whether a controversion that is not made in good faith under *Harp* is always frivolous or unfair under AS 23.30.155(o), both the Board and the Commission linked the penalty provisions of AS 23.30.155(e)-(f) to the unfair or frivolous controversion provision of AS 23.30.155(o).

Courts from other states have imposed a penalty when an employer's action delayed prescribed medical care. The Louisiana Court of Appeal held that a penalty should be imposed on an insurer when its decision to have prescriptions filled by a mail

---

[41]    *Id.* at 506-07.

[42]    *See Sumner v. Eagle Nest Hotel*, 894 P.2d 628, 631 (Alaska 1995) ("[A] controversion that does not delay payment, even if made in bad faith, does not provide the basis for a penalty.").

[43]    8 Alaska Administrative Code (AAC) 45.182(e) (2012) (emphasis added).

order pharmacy resulted in a delay in delivery of the prescribed drugs.[44] The workers' compensation statute provided that the employer had to provide necessary drugs for treatment, and the court interpreted the statute as requiring that "those necessary drugs be provided timely."[45] The court held that the employer "effectively denied [the employee] the drugs needed for his compensable injury by denying the timely availability of those prescription drugs" and remanded the case for imposition of a penalty.[46]

The Pennsylvania Commonwealth Court upheld the imposition of a penalty against an employer when an employee was unable to obtain her prescription medication after the employer's insurer cancelled her prescription card without explanation.[47] The court decided that a penalty could be imposed even though the employee had not presented a bill for reimbursement because the employer had set up a system for her to get the medication and then unilaterally terminated it.[48]

The most closely analogous case to the present case is also from Pennsylvania. The Pennsylvania Commonwealth Court decided that a penalty was appropriate when an insurer refused to pre-certify back surgery and failed to file a "[utilization review] determination petition" prior to its refusal.[49] The worker's back

---

[44]    *Sigler v. Rand*, 896 So. 2d 189, 198 (La. App. 2004).

[45]    *Id.* (citing LA. REV. STAT. ANN. § 23:1203(A)).

[46]    *Id.* at 198-99.

[47]    *Brenner v. Workers' Comp. Appeal Bd. (Drexel Indus.)*, 856 A.2d 213, 216 (Pa. Commw. 2004).

[48]    *Id.*

[49]    *McLaughlin v. Workers' Comp. Appeal Bd. (St. Francis Country House)*,
(continued...)

injury had been found compensable, but at the time of the surgery request, the employer refused to pre-certify it because its doctor contended the employee had fully recovered from the work-related injury.[50] The worker was unable to have the surgery after the insurer refused to authorize it.[51] The administrative law judge imposed a penalty of 20% of the claimant's compensation for more than a year, from the date of the scheduled surgery to the date of the administrative decision.[52] The insurer argued on appeal that a penalty could be assessed only when it failed to pay a bill that had been presented for payment.[53] Calling the employer's argument "disingenuous," the court disagreed because the insurer's "own action effectively prevented Claimant from receiving the recommended treatment in the first place"; it thus upheld the penalty.[54]

The argument rejected by the Pennsylvania court is similar to the Commission's view in this case that no penalties could be imposed on the improper controversion of the Clinitron bed because "no bills were presented for payment." But a rule that a penalty can be imposed only when a bill is presented for payment can result in an insurer never being penalized for issuing a controversion that is not made in good faith because the worker may not be able to afford the treatment on his own. Such a controversion could prevent an injured worker from receiving the treatment, so there would never be a bill to present for payment. The Commission's construction of the

---

[49]   (...continued)
808 A.2d 285, 290 (Pa. Commw. 2002).

[50]   *Id.* at 287.

[51]   *Id.*

[52]   *Id.* at 288.

[53]   *Id.* at 288-89.

[54]   *Id.* at 289-90.

statute is contrary to the statute's purpose of providing "quick, efficient, fair, and predictable delivery" of medical benefits to a claimant.[55] And if an employer can choose to controvert, without good reason, treatment that it has been providing for years, as M-K Rivers did here with Harris's hypertension medication, and does not suffer a penalty, it has no incentive to consider carefully whether it should controvert. We therefore hold that the Commission erred in deciding that as a matter of law no penalty could be imposed for the bad faith controversion of the Clinitron bed.

The Commission also concluded that no penalty could be imposed for the controversion of treatment for diabetes, hypertension, and sleep apnea, in spite of M-K Rivers's concession that this controversion was "a mistake," because "no bills were presented for payment." In its brief before us, M-K Rivers asserts that the adjuster "continued to pre-authorize . . . blood pressure medication (Vasotec) before, during, and after the time the mis-drafted controversion notice was filed." Our review of the record does not support this contention. The adjuster testified at the July 2009 Board hearing that she had *denied* the Vasotec prescription sometime before the hearing and that as of the hearing date the medication had *not* been paid for. She said that she would pay for it after the hearing. In addition, Harris submitted documentary evidence at the hearing that included medical bills he had paid and for which he sought reimbursement. Among the expenses were receipts for prescriptions tied to treatment for insomnia, which the record shows was "secondary to his underlying sleep-disordered breathing," or sleep apnea. It is unclear from the record whether other related treatment was denied or unreimbursed.

M-K Rivers advances several arguments in its brief before us about why a penalty on the controversion of the bed was unfounded. It does not, however, contest

---

[55]     AS 23.30.001(1).

the fact that Dr. Chitnis's report did not give an opinion about the type of bed Harris needed: Her report said that she did "not have enough experience to recommend one bed over the other." Besides relying on Dr. Chitnis's opinion, the controversion of the bed said that the insurer would "agree to the rental/purchase of the Beriatric bed frame," but a Beriatric bed frame is not mentioned in Dr. Chitnis's report.[56] It is unclear from the record whether the employer provided a Clinitron bed or some other type of medical bed to Harris during the course of these proceedings.[57]

Because the factual record is unclear, we remand this issue to the Commission, with instructions to remand to the Board. Harris is free to pursue a penalty on the controversion of the bed or other treatment items that were unpaid because of the controversion, and the Board can determine what penalty is due on the improperly controverted prescriptions or treatments.

## C. Future Claims For Diabetes Treatment And Non-Medical Fitness Facility Attendance

As part of its decision, the Board ordered that M-K Rivers could not "unilaterally controvert or terminate diabetes treatment and care, or [Harris's] attendance at a non-medical fitness facility, without first filing a petition seeking relief." Its order was based on the parties' 1998 stipulation that (1) Harris's diabetes was compensable;

---

[56]     The record contains many documents related to Harris's beds, beginning in 2005. There are at least three prescriptions from 2007 in the record for a Clinitron bed, including a detailed one from Dr. Ross. In March 2007 Dr. Julie Hyman of Stanford Hospital wrote a letter saying that "the Clinitron bed" was medically necessary; the letter shows it was faxed to the adjuster.

[57]     At the hearing M-K Rivers asked one of Harris's doctors if the doctor was "aware that Mr. Harris did, in fact, get a bed after [the doctor's] deposition." The doctor was deposed in January 2008, but a copy of the entire deposition is not in the record. The first indication that Harris was withdrawing the request for a Clinitron bed was a prehearing conference summary from April 7, 2008.

(2) M-K Rivers would pay for "past and continuing diabetes treatment and care"; and (3) use of a non-medical fitness facility was "appropriate, reasonable and necessary pursuant to the Alaska Workers' Compensation Act."

The Commission interpreted this part of the Board's order as broadly prohibiting any future controversions of diabetes treatments or attendance at a non-medical fitness facility. Consequently the Commission decided that the Board had exceeded its authority and reversed the Board "to the extent that its order appeared to erroneously foreclose M-K Rivers from asserting any defense to diabetes treatment and attendance at a non-medical fitness facility without first petitioning for relief from the 1998 stipulation." Harris appeals this part of the Commission's decision, contending that the Commission's order would permit the insurer to controvert the compensability of Harris's diabetes again.

The two agency decisions call for minor clarification. In its order, it appears that the Board wanted to prevent M-K Rivers from again unilaterally controverting the compensability of Harris's diabetes. Because the parties entered into a stipulation about the compensability of the diabetes in 1998 and filed the stipulation with the Board, the stipulation had the effect of a Board order.[58] M-K Rivers preserved defenses such as the reasonableness or necessity of a particular diabetes treatment in this stipulation, but it agreed that the condition itself was compensable. Yet in June 2007 M-K Rivers claimed that Harris's diabetes was not a compensable condition; it did not limit its controversion to a specific diabetes treatment. We have held that "the employer or insurer must petition the Board for rehearing or modification of its order on the basis

---

[58]    8 AAC 45.050(f) (2012).

of 'a change in conditions' " if payments are being made pursuant to a Board order.[59] Because the compensability of the diabetes was part of a Board order, M-K Rivers was required to petition the Board for modification of the order in order to contest the continuing compensability of the condition.[60]  The Board correctly prohibited M-K Rivers from unilaterally controverting the compensability of Harris's diabetes in the future.  The same is true of Harris's use of a non-medical fitness facility.  M-K Rivers stipulated that use of such a facility was "appropriate, reasonable and necessary," so M-K Rivers cannot unilaterally controvert use of the facility on this basis.[61]  It can, however, controvert the reasonableness or necessity of a proposed treatment or medication for diabetes.  It appears that the Commission understood the Board's order in this way.

### D.    Attorney's Fees

Harris appeals the Commission's reversal of the Board's attorney's fees award.  Because we are reversing the main parts of the Commission's decision that Harris appealed to us, we vacate the Commission's decision about attorney's fees and reinstate the Board's award.  In addition, the Commission should award Harris fees on remand related to his appeal there.

---

[59]    *Underwater Constr., Inc. v. Shirley*, 884 P.2d 156, 161 (Alaska 1994) (quoting AS 23.30.130(a)).

[60]    *See id.*

[61]    It is unclear to what extent use of a non-medical fitness facility was an issue prior to the hearing.  M-K Rivers controverted medical costs "other than those that are reasonable and necessary and/or as outlined by Dr. Chitnis in her reports."  Dr. Chitnis may not have been aware of the stipulation because her report indicated that a "[g]ym program may not be considered absolutely essential."  She nonetheless recommended continuing it because of the benefits Harris got from the exercise.

## V. CONCLUSION

We AFFIRM the Commission's decision that the controversion issue was properly before the Board. We REVERSE the Commission's decision regarding penalties, and REMAND with instructions to remand to the Board. We VACATE the Commission's reversal of the Board's award of attorney's fees, reinstate the Board's award, and REMAND to the Commission to award fees for Harris's appeal in the Commission.