*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| FELIPE M. ESPINDOLA, | ) | |
| | ) | Supreme Court No. S-17683 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 17-019 |
| | ) | |
| PETER PAN SEAFOODS, INC. and | ) | O P I N I O N |
| SEABRIGHT INSURANCE | ) | |
| COMPANY, | ) | No. 7529 – May 14, 2021 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Felipe M. Espindola, pro se, Grandview, Washington, Appellant. Michelle M. Meshke, Meshke Paddock & Budzinski, Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

MAASSEN, Justice.

I.    INTRODUCTION

        A cannery worker reported two injuries, one to his back and one to his shoulder, suffered at different times but while working for the same employer. The employer paid some medical benefits for both injuries but eventually controverted its obligation to provide further care. The Alaska Workers' Compensation Board denied

the worker's claim for more medical benefits, and the Alaska Workers' Compensation Appeals Commission affirmed the Board's decision. The worker appeals, representing himself. We conclude that the Commission properly affirmed the Board's decision as to the back injury but that the Board's findings as to the shoulder injury lack adequate support in the record. We therefore reverse the Commission's decision in part and remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

Felipe Espindola lives in Washington and has worked seasonally in Alaska in the seafood industry for a number of years, including work for Peter Pan Seafoods from 2002 until 2013. He usually worked from January to April in King Cove, then from June to September in Dillingham; other times of year he worked picking fruit in Washington. Espindola is not a fluent English speaker and had a translator at the Board hearing, his deposition, and some medical appointments.

Espindola first reported an injury to his back in April 2009 when he was working for Peter Pan in King Cove spreading cod bellies, but he did not miss any work at that time. He saw a doctor after he returned to Washington, about three weeks after the injury, and the doctor diagnosed a lumbar strain and told him to take two weeks off.

Espindola returned to the doctor in May and August 2009. In August of that year he had an MRI, which showed degenerative changes in the lumbar spine. In October he began a course of physical therapy which evidently improved his function, and in early 2010 he came back to Alaska for work.

Espindola again sought medical attention for his back in Washington in April 2010, and he was diagnosed with degenerative disc disease. He completed another course of physical therapy that spring and summer and had a series of three epidural steroid injections in June and July. The injections provided minimal pain relief, but his

healthcare provider decided in November 2010 that he was medically stable and could return to work.

Espindola's second reported injury related to shoulder pain, which began in August 2012 while he was working for Peter Pan in Dillingham trimming salmon fillets. He usually worked on one side of the conveyor belt but one day was assigned to the other; he explained at his deposition that this meant he had to cut fish to the left instead of to the right as he usually did. Further information about the injury is not entirely consistent. According to contemporaneous medical records, Espindola began to feel pain in his arm and shoulder as he worked; it "started in his little finger . . . like pins and needles, and gradually it [went] all the way up to his neck." The report of injury describes pain occurring "after 8 hours of repetitive movement . . . as the movement to remove bones was different." But at his deposition Espindola testified that at some point he "felt a click" in his right shoulder "[a]nd then with the movement, it got numb."

Espindola went to the walk-in clinic in Dillingham and saw a doctor, who diagnosed nerve impingement in his neck from overuse and instructed him to wear a sling for three days. Back in Washington in September, Espindola consulted with a physician assistant who wrote a note for a few weeks of modified duty and referred him to physical therapy. The physical therapy helped, though he still had "mild residual symptoms." He reported "occasional weakness" in his right hand, and the doctor observed decreased grip strength, so the doctor referred him for a shoulder MRI. In November Espindola reported that his shoulder pain kept him from his usual work picking apples. He nonetheless returned to Alaska for seasonal cannery work in early 2013.

An MRI of Espindola's shoulder in August 2013 showed arthritic changes, tears in tendons that are part of the rotator cuff,[1] and a labral[2] cyst, which a doctor later said could mean a labral tear. Espindola was given a steroid injection in the shoulder but had only short-lived pain relief. He received care for his lower back pain at this time as well.

Peter Pan sent Espindola to an employer's medical evaluation (EME) with Dr. Paul Reiss, an orthopedic surgeon, in September 2013. Dr. Reiss diagnosed degenerative disc disease in the lumbar spine and degenerative arthritis in the right shoulder. Dr. Reiss did not think the work injuries had permanently aggravated either condition, and in his opinion both arthritic processes predated the work injuries. Dr. Reiss acknowledged that Espindola suffered a work-related back injury in 2009, but he believed that injury was no longer the substantial cause of the back condition. In Dr. Reiss's opinion, Espindola was medically stable with respect to the work-related injuries, and they required no further medical care. Peter Pan controverted all benefits after receiving this report.

Espindola's shoulder pain increased for no reason he could identify, leading him to again seek medical care in April 2014. He informed a physician assistant that the

---

[1] The MRI showed problems with the subscapularis, the supraspinatus tendon, and the infraspinatus tendon. The rotator cuff of the shoulder is defined as "anterior, superior, and posterior aspects of the capsule of the shoulder joint reinforced by the tendons of insertion of the supraspinatus, infraspinatus, teres minor, and subscapularis (SITS) muscles." *Rotator cuff of shoulder*, STEDMAN'S MEDICAL DICTIONARY, Westlaw (database updated Nov. 2014).

[2] A labrum is "[a] fibrocartilaginous lip around the margin of the concave portion of some joints." *Labrum*, *id.* The shoulder joint is also known as the glenohumeral joint. *Glenohumeral joint*, *id.* The "glenoid labrum of scapula" is "a ring of fibrocartilage attached to the margin of the glenoid cavity of the scapula to increase its depth." *Glenoid labrum of scapula*, *id.*

pain interfered with his sleep and got worse when he tried to work picking apples and grapes. The physician assistant did not impose any formal work restrictions because "the claim is not open and accepted at this time," but he nonetheless recommended that Espindola look for work that did not require him to raise his arm above shoulder level. Imaging in July 2014 was similar to the 2013 MRI, with the exception of a change related to the infraspinatus.

Espindola filed a written workers' compensation claim in the spring of 2014, seeking medical and transportation costs as well as a finding that Peter Pan's controversion of his claim was unfair and frivolous. Peter Pan again controverted the claim.

Espindola continued to get medical care throughout 2014 for both his shoulder and his back. Following a diagnosis of shoulder impingement syndrome, he consulted with a surgeon. The surgeon cautioned that surgery might not alleviate the pain and that the rehabilitation process would be "prolonged." In early 2015 Dr. Reiss did another EME, which did not change his earlier opinion that Espindola's continuing problems were not work-related.

In April 2016 the parties stipulated to a second independent medical evaluation (SIME) for both the back and the shoulder, and the Board appointed Dr. James F. Scoggin III to do the evaluation. Dr. Scoggin's report concluded that work with Peter Pan was likely not the substantial cause of Espindola's back condition but likely was the substantial cause of his shoulder condition and the related need for medical care. According to Dr. Scoggin, Espindola's work-related shoulder conditions included a labral tear and a possible rotator cuff injury; Dr. Scoggin also diagnosed arthritis in the shoulder, though noting that this condition was "non-industrial." Dr. Scoggin did not diagnose a specific problem with Espindola's lower back, saying

simply that the patient had "low back pain . . . already noted to have been present for 4 years at the time of [a] 12/18/08 note" in a medical chart.

In explaining his diagnoses, Dr. Scoggin observed that Espindola had not had shoulder pain before the incident at Peter Pan and had had "consistent complaints of right shoulder pain" ever since. Dr. Scoggin considered the mechanism of the work activity to be an adequate explanation for a labral tear and a possible rotator cuff tear. Because Espindola's account of the shoulder pain was not entirely consistent, Dr. Scoggin clarified in his deposition that he believed the shoulder injury could be explained by either a repetitive-motion injury or trauma from "an individual cut."

Espindola's submissions to the Board included medical records from two doctors he had consulted in Mexico. One record was a statement from Dr. J. Jesús Campos Chávez, along with an English translation. Dr. Campos, an orthopedist, diagnosed chronic low back pain exacerbated by flexion; he noted that Espindola's pain made it difficult for him to walk or to carry more than 25 kilograms. Imaging studies showed scoliosis as well as degenerative changes in the lumbar spine. Dr. Campos diagnosed degenerative spondyloarthropathy[3] in the spine and recommended weight loss and core muscle strengthening in addition to limitations on some activities. Dr. Campos's statement did not recommend surgery, and, aside from noting that the condition was secondary to a work accident, it had no causation analysis.

Espindola testified at his deposition about the other doctor he had seen in Mexico for his back, Dr. Victor Díaz Giner, a radiologist; he later submitted Dr. Díaz's

---

[3]     Spondyloarthropathy refers to a class of "inflammatory rheumatic diseases that cause arthritis" such as psoriatic arthritis or ankylosing spondylitis; they can be hereditary. *Spondyloarthritis*, *Fast Facts*, AM. COLL. OF RHEUMATOLOGY, https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Spondyloarthritis (last visited Nov. 4, 2020).

report, along with an English translation, to the Board. According to Espindola, Dr. Díaz told him that "with an operation [he] should be fine." Dr. Díaz's report appears to be similar to the MRI report on Espindola's back done in Washington in August 2013.

The Board held a hearing on Espindola's claims in August 2017, with Espindola representing himself with assistance from an interpreter. The only witnesses at the hearing were Dr. Reiss and Espindola; the Board also had a transcript of Dr. Scoggin's deposition. Dr. Reiss questioned Dr. Scoggin's conclusions about the shoulder as well as his measurements of certain movements. Dr. Reiss's testimony suggests that he was not asked to consider whether Espindola's shoulder pain could be related to a repetitive-motion-type claim: after explaining that he been asked to focus on the day of the 2012 injury, he said, "If [Espindola] would like to file another claim for what he's doing for all these other days, I would be happy to see him for that claim and discuss it on its own merits." Dr. Reiss pointed to the change in the infraspinatus between two shoulder MRIs to support his opinion that Espindola did not have a superior labrum anterior and posterior (SLAP) tear, as other examining doctors had suggested. Dr. Reiss opined that the new finding related to the rotator cuff shown on the 2014 MRI was likely related to degenerative changes, and that the labral tear was degenerative as well.

Espindola testified about working conditions at Peter Pan, suggesting that his back pain described in the pre-2009 medical records was also related to his work there. He said he had not filed an earlier workers' compensation claim because doctors had not been able to identify any damage to his back before 2009. His testimony focused on his pain and the problems it caused him. Peter Pan's attorney asked Espindola about his work in agriculture in Washington. Espindola agreed that he had picked apples seasonally since 2002 and that the work required him to lift his hands above his shoulders; he said he could not do it much anymore because of his shoulder pain.

The Board applied its three-step presumption analysis to each claim for medical care, finding that Espindola had attached the presumption of compensability as to both his back and his shoulder. The Board concluded that Peter Pan rebutted the presumption for both conditions with Dr. Reiss's opinions. At the third stage, when the Board weighed the evidence, it decided first that Espindola failed to meet his burden of proof about his back injury; it relied on both Dr. Reiss's and Dr. Scoggin's opinions for this conclusion. As for the shoulder, the Board gave the most weight to Dr. Reiss's opinions and again rejected Espindola's claims.

In explaining its evaluation of the evidence, the Board said that Espindola's "description of how the injury occurred changed over time, and Dr. Scoggins [sic] relied heavily on the description [Espindola] gave at the time of the SIME." The Board also thought Dr. Scoggin did not "appear to differentiate between the supraspinatus tear" on the August 2013 MRI "and the infraspinatus tear" on the July 2014 MRI. The Board cited Dr. Reiss's explanation that Espindola's "description of the injury would not cause the supraspinatus tear shown on the first MRI." The Board's very brief summary of Dr. Scoggin's report and testimony does not mention either the infraspinatus or the supraspinatus; it indicates only that Dr. Scoggin diagnosed a labral tear.[4] The Board also decided that Peter Pan had not filed an unfair or frivolous controversion.

---

[4]    The supraspinatus and infraspinatus are muscles, attached to the bone by tendons. *Supraspinatus*, *infraspinatus*, STEDMAN'S MEDICAL DICTIONARY, Westlaw (database updated Nov. 2014). The tendons are part of the rotator cuff. *See supra* note 1. The labrum is made of cartilage. *See supra* note 2. The labrum in the shoulder is part of the scapula; according to a medical dictionary, the "glenoid labrum of scapula" is "a ring of fibrocartilage attached to the margin of the glenoid cavity of the scapula to increase its depth." *Glenoid labrum of scapula*, STEDMAN'S MEDICAL DICTIONARY, Westlaw (database updated Nov. 2014).

Espindola appealed to the Commission. He primarily argued that the Board's decision, with its focus on Dr. Reiss's opinions, erroneously failed to take into account the views of other doctors. The Commission affirmed the Board's decision, deciding that it was supported by substantial evidence in the record. The Commission pointed out that the Board acted within its authority when it chose to credit Dr. Reiss's opinions over those of other doctors. It further noted that the record lacked reports from some of the doctors Espindola now relied on and that it could not consider evidence that had not been presented first to the Board; however, it reminded Espindola that he could file a new claim if he believed he had new medical evidence to support it.

Espindola appeals.

## III. STANDARD OF REVIEW

In an appeal from the Commission, we review the Commission's decision and not the Board's.[5] We review de novo the Commission's legal conclusion that substantial evidence supports the Board's factual findings by "independently reviewing the record and the Board's findings."[6] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7] "Whether the quantum of evidence is substantial is a question of law."[8] "Whether the [B]oard made

---

[5] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017).

[6] *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014) (citing *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010)).

[7] *Id.* at 1179 (quoting *DeYonge v. NANA/Marriott*, 1 P.3d 90, 92 (Alaska 2000)).

[8] *Id.*

sufficient findings is a question of law that we review de novo."[9]

## IV.  DISCUSSION

Espindola argues, as he did before the Commission, that the Board "did not take into consideration all of the doctor[s'] point[s] of view as well as witness statements."  He asserts that there were doctors willing to testify that his injuries were work-related, but he does not explain why he did not call them as witnesses.  He contends that even if he did have osteoarthritis or other preexisting conditions, he was still injured on the job and has "had a lot of pain and suffering" as a result.  Peter Pan asks us to affirm the Commission's decision, arguing that the Board's decision had substantial evidentiary support and the Commission properly deferred to the Board's assessment of the evidence.

Because the Commission, like the Board, considered Espindola's two injuries individually, we do the same.

### A.     The Commission Correctly Concluded That Substantial Evidence Supports The Board's Decision About The Back Injury.

The only benefit Espindola sought was medical care; with respect to his lower back, it was not clear what medical care he wanted the Board to order.  He testified at his deposition that Dr. Díaz told him surgery would resolve his pain, but the medical records from Dr. Díaz do not support this assertion.  Dr. Campos recommended essentially conservative care for Espindola's back pain.  No Washington doctor recommended back surgery.

Assuming Espindola *does* need further medical care for his lower back, substantial evidence supports the Board's decision that Espindola's work with Peter Pan was not the substantial cause of that need.  Both Dr. Reiss and Dr. Scoggin diagnosed

---

**9**     *Pietro v. Unocal Corp.*, 233 P.3d 604, 611 (Alaska 2010) (alteration in original) (quoting *Leigh v. Seekins Ford*, 136 P.3d 214, 216 (Alaska 2006)).

degenerative disc disease unrelated to Espindola's 2009 work injury.[10] The Board has authority to weigh the evidence, including medical opinions.[11] The Board discussed both Dr. Reiss's and Dr. Scoggin's opinions about Espindola's back; their opinions certainly support a reasonable conclusion that the work injury at Peter Pan was no longer the cause of his back pain. Unless "the evidence detracting from the agency's decision" was "dramatically disproportionate to the evidence supporting" it, we must affirm it.[12] And there is little evidence detracting from the Commission's decision about Espindola's lower back pain.

The medical records show that Espindola had lower back pain at least beginning in 2004, and from imaging studies his doctors diagnosed degenerative disc disease. Few if any doctors thought anything other than conservative treatment was warranted, and at least one of Espindola's treating doctors in Washington considered him to be medically stable with regard to the 2009 injury. Neither Dr. Scoggin nor Dr. Reiss thought Espindola's ongoing back pain was related to his work in general or to the 2009 incident in particular.

---

[10] Dr. Scoggin's report appears to be limited to the 2012 shoulder injury, but at his deposition he agreed with Dr. Reiss's opinion about the effects of the 2009 back injury.

[11] AS 23.30.122.

[12] *Alaska Police Standards Council v. Maxwell*, 465 P.3d 467, 473 (Alaska 2020) ("While [substantial evidence] is a deferential standard, we will 'review the entire record to ensure that the evidence detracting from the agency's decision is not dramatically disproportionate to the evidence supporting it such that we cannot "conscientiously" find the evidence supporting the decision to be "substantial." ' " (emphasis omitted) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 635 n.40 (Alaska 2011))).

While the Board did not summarize all of Espindola's medical evidence, its failure to do so is not a reason for us to reverse the decision. The Board is required to make findings only about issues that are material and contested;[13] it does not need to discuss all medical records before it. The medical records about Espindola's lower back are consistent for the most part, and Espindola did not explain how the information he cited to the Commission undercut the evidence on which the Board relied.[14] Dr. Campos noted Espindola's report that his chronic back pain was "secondary to a labor accident," but the doctor made no analysis of causation himself, and he diagnosed a type of arthritis that was not clearly work related. Dr. Díaz's report said nothing at all about causation.

Because the Commission correctly concluded that substantial evidence in the record supported the Board's decision about Espindola's lower back, we affirm this aspect of its decision.

### B. The Commission Erred In Concluding That Substantial Evidence Supports The Board's Decision About The Shoulder Condition.

We turn next to the shoulder injury. The testimony and reports from Espindola's treating doctors did not diagnose this condition with certainty, noting a possible SLAP tear, a possible rotator cuff injury, and a possible labral tear. Dr. Scoggin diagnosed a work-related "[r]ight shoulder posterior labral tear" as well as a "possible partial-thickness rotator cuff tear" that could have been caused by work. Dr. Reiss, on the other hand, thought all of Espindola's shoulder problems were degenerative.

---

[13] *Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1275 (Alaska 1999).

[14] Like the Commission, we did not find medical records from either a Dr. David or a Dr. Brian in the record. Two of Espindola's physical therapists were Bryan Davis and David Bullock; their reports were included in the records provided to Dr. Scoggin.

The Board gave more weight to Dr. Reiss's opinion because in its view Dr. Scoggin's opinion "relied heavily on the description [Espindola] gave at the time of [the] SIME." But the record does not support this conclusion; Dr. Scoggin indicated that Espindola's work at Peter Pan could have caused a labral tear regardless of how the injury was described. Dr. Scoggin acknowledged that Espindola's account of the injury had changed, saying "that the most consistent mechanism described was cutting the fillets, and whether it was one specific fillet or whether it was doing things all day long . . . has varied." But Dr. Scoggin said either mechanism could explain the posterior labral tear he had diagnosed; he did not think the preexisting arthritis eliminated work as a factor. He testified, "The injury, I think, is the labral tear, and the mechanism whether it's an individual cut or repetitive cuts, which specific cut caused the injury to the shoulder may not be . . . it's probably unknowable, but yet he was doing that activity and the pain began that day." He concluded, "In my opinion, the substantial cause of his labral tear and pain was the cutting activities that he did on that date."

The other reason the Board gave for rejecting Espindola's claim was that Dr. Scoggin did not "appear to differentiate between the supraspinatus tear shown on the August 2, 2013 MRI and the infraspinatus tear shown on the July 21, 2014 MRI." But Dr. Scoggin's principal diagnosis was not a rotator cuff injury; his only explicitly work-related diagnosis was the posterior labral tear. Although his report mentioned a "possible partial-thickness rotator cuff tear" in the August 2013 MRI report, we see nothing in the record suggesting that this injury, whatever it was, was related to the labral tear that Dr. Scoggin unequivocally diagnosed.

Because the Board's crucial findings supporting its decision with regard to Espindola's shoulder injury are not supported by the record, the Commission erred in concluding they were.

**C.  The Commission Correctly Concluded That Substantial Evidence Supports The Board's Finding About The Controversions.**

It is not clear that Espindola is challenging the Commission's decision about the controversions, but we agree with the Commission that they were not unfair or frivolous. An employer may be penalized if its controversion is not made in good faith.[15] "For a controversion notice to be filed in good faith, the employer must possess sufficient evidence in support of the controversion that, if the claimant does not introduce evidence in opposition to the controversion, the Board would find that the claimant is not entitled to benefits."[16] Peter Pan had adequate evidence to support its controversions because they relied on Dr. Reiss's EME reports, which provided enough evidence to meet the *Harp* standard.

**V.  CONCLUSION**

We AFFIRM the Commission's decisions that substantial evidence in the record supported the Board's decision about Espindola's low back condition and that the controversions were not unfair or frivolous. We REVERSE the Commission's decision that substantial evidence supported the Board's decision about Espindola's shoulder condition and REMAND this case for further proceedings.

---

[15]  *Harp v. ARCO Alaska, Inc.*, 831 P.2d 352, 358 (Alaska 1992).

[16]  *Id.*