NOTICE

*The text of this opinion can be corrected before the opinion is published in the <u>Pacific Reporter</u>. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | | |
|---|---|---|
| I.J., a minor, | | Court of Appeals No. A-14275 |
| Appellant, | | Trial Court No. 3AN-20-00125 DL |
| v. | | |
| STATE OF ALASKA, | | O P I N I O N |
| Appellee. | | No. 2785 — July 19, 2024 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances: Michael L. Barber, Barber Legal Services, Boston, Massachusetts, under contract with the Office of Public Advocacy, Anchorage, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for guardian ad litem.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge ALLARD.

I.J. was adjudicated a juvenile delinquent for fourth-degree assault after he hit another juvenile with a skateboard.[1] During the pendency of his case, I.J. was placed in multiple foster care placements and various residential treatment programs. I.J. repeatedly ran away from his placements and was also discovered to have used drugs. Adjudication was held in abeyance while the parties struggled to find a placement from which I.J. would not abscond. After more than nine failed placements and I.J.'s admissions to nine conduct violations, the superior court concluded that a disposition order under AS 47.12.120(b)(1) — *i.e.*, an order that allowed the Department of Family and Community Services to place I.J. at McLaughlin Youth Center — was the least restrictive alternative available to I.J.

For the reasons explained here, we affirm this order.

*Relevant facts*

In September 2020, thirteen-year-old I.J. was in the custody of the Office of Children's Services and had been placed in an emergency foster home. I.J. and another juvenile at the foster home threw eggs at a neighbor's home. After the other juvenile admitted what they had done, the two boys got into an altercation, and I.J. hit the other juvenile with a skateboard, causing a black eye. When the police were called, I.J. ran away to his great-grandmother's house. I.J. was later charged in a juvenile delinquency petition with fourth-degree assault.

I.J. was placed at a new foster home, but he ran away from the home and was missing for a week. I.J. was subsequently placed at the Covenant House (a shelter for youth) and was then held in temporary detention at the McLaughlin Youth Facility. I.J. signed a conduct agreement, agreeing to stay at his next placement, obey curfew, and "not ingest illegal drugs or alcohol."

---

[1]　AS 11.41.230(a)(2).

In February 2021, I.J. was released to his great-grandmother and then, in April 2021, transferred to a foster home. However, I.J. ran away from the foster home less than a month later. Because I.J.'s act of running away was in violation of his conduct agreement, the Division of Juvenile Justice filed a petition to modify or revoke the conduct agreement.[2]

After a brief stay at McLaughlin, I.J. was returned to the foster home and was initially reported as doing "fairly well" and being "engaged in services at Denali Family Services." However, a week after this good report, I.J. ran away from the foster home. The Division filed a second petition to modify or revoke the conduct agreement while I.J. was still missing. I.J. was subsequently found sleeping in the back of a car with another runaway minor. I.J. was then temporarily detained at McLaughlin as a flight risk.

At an August 2021 detention hearing, I.J. was reported to be "doing well in detention" as his team (I.J.'s juvenile probation officer, I.J.'s guardian ad litem, and I.J.'s attorney) struggled to find him a placement from which he would not run away. I.J.'s guardian ad litem stated that I.J. was "in dire need" of mental health services. I.J. was detained at McLaughlin for just over seven weeks, and was then temporarily placed in a foster home before moving to the Pathway Home, a residential treatment program, at the end of September.

The parties then reached a plea agreement, whereby I.J. admitted to the fourth-degree assault and the two prior conduct violations for running away from placements. I.J.'s adjudication was held in abeyance pending his successful completion of treatment at the Pathway Home. I.J.'s juvenile probation officer's plan was to dismiss the charges once I.J. stabilized and progressed in treatment. I.J. signed a new conduct agreement, agreeing to stay at the Pathway Home, not take "illegal drugs or alcohol,"

---

[2]    The Division of Juvenile Justice is a division of the Department of Family and Community Services.

and "participate in and successfully complete residential treatment at The Pathway Home."

In February 2022, I.J. ran away from the Pathway Home, approximately five months into his stay. A third petition to modify or revoke the conduct agreement was filed. After being detained by the police days after running away, I.J. was temporarily returned to McLaughlin.

I.J. was subsequently placed in a new foster home, and seemed to be doing well. But in July 2022, approximately four months later, I.J. ran away from the foster home and a fourth petition to modify or revoke the conduct agreement was filed. I.J. was missing for almost a month. He was seen running from the police and a juvenile probation officer. He was later arrested by the police who had to chase him to arrest him. The Division filed a petition to modify or revoke the conduct agreement based on I.J.'s running from the police and his alleged resisting arrest. (The resisting arrest conduct violation was later dismissed.)

I.J. was held in temporary detention at McLaughlin while his team searched for alternative placements. The probation officer and guardian ad litem told the court that they were trying to get I.J. into Raven's Way, a wilderness outdoor program that I.J. was excited about.

I.J. was later released to the Raven's Way program in Sitka, which he successfully completed without running away.

After completing Raven's Way, I.J. was returned to a foster home, where he received services through the outpatient program of Volunteers of America. I.J. struggled in the outpatient program, and Volunteers of America recommended a higher level of treatment through its residential substance abuse program, Adolescent Residential Center for Help (ARCH).

In accordance with this recommendation, I.J. was placed at ARCH. However, he ran away less than a month later. When he was found a few days later, he

tested positive for marijuana. The Division filed a new petition to modify or revoke the conduct agreement based on I.J.'s running away and his drug use.

I.J. was temporarily detained at McLaughlin pending his next placement. He received overall positive reports during his time at McLaughlin.

In March 2023, I.J. was placed at the Charlie Elder House, a group home that also helps teach independent living skills. I.J. signed a new conduct agreement, agreeing to stay at the Charlie Elder House, not take "illegal drugs or alcohol," and "participate in and successfully complete the Charlie Elder House program."

A few days after arriving at the Charlie Elder House, I.J. tested positive for benzodiazepines. Less than a month later, I.J. ran away from Charlie Elder House. I.J. was missing for three weeks. The police ultimately found I.J. in an apartment with other juveniles, hiding in the closet. He lied to the police about his identity. The Division filed a new petition to modify or revoke the conduct agreement based on I.J.'s use of benzodiazepines and his act of absconding.

At the detention review hearing on May 8, 2023, a former foster parent of I.J., Katie Marrera, called into the hearing. Marrera explained that she knew I.J. before he went into care, and that she had been "heavily involved in his life and case since he came into care." Marrera said that she had talked to her husband, and he was looking into getting re-licensed in order to take placement of I.J. Marrera stated that she wanted to get I.J. into "wraparound services" and to ensure that he received appropriate mental health evaluations. Marrera stated that I.J. kept repeating the same pattern of going to treatment and then running, and he needed to be in a place where he felt safe and loved.

The guardian ad litem agreed with much of what Marrera said, although the guardian ad litem pointed out that I.J. had received "consistent weekly, if not more, therapy to address [his] trauma" at the Pathway Home, Raven's Way, and the Volunteers of America programs. The guardian ad litem also pointed out that I.J. had received wraparound services at another foster home. The guardian ad litem noted that I.J. had run away from each placement where he had been receiving services, and he

expressed concern that without services, I.J. would be "setting himself up to end back [at McLaughlin]."

I.J.'s case worker from the Office of Children's Services also expressed her concern that the places to which I.J. runs are not always safe, and that children on the run are vulnerable. The court decided to temporarily detain I.J. at McLaughlin until the foster placement with Marrera was available.

Nine days later, on May 17, 2023, I.J. was placed at the Marrera-Castro foster home. Less than a month later, I.J. ran away and was missing for nearly three weeks. It was also discovered that, before running away, I.J. had left the placement multiple times but either returned or was found. Marrera later testified that she had, at one point, found I.J. in a park, intoxicated, with scratches all over his body. The Division filed a petition to revoke or modify the conduct agreement based on I.J.'s running away.

At the arraignment on the conduct violation, I.J.'s juvenile probation officer indicated that he no longer believed any less restrictive alternatives besides McLaughlin remained for I.J. I.J.'s guardian ad litem agreed, noting that Marrera "went really out on a limb to help him." The guardian ad litem pointed out that Marrera had put an education plan in place, arranged for a physical examination, scheduled him for a neuropsychological evaluation, and did "a lot of leg work in hopes of [I.J.] following through with his plan to go the Military Youth Academy." However, I.J. still ran away from the home and it was actually "a home he wanted to go to, had connection with."

I.J.'s attorney asked that the team continue to work together to try to resolve I.J.'s charges and get him into the Alaska Military Youth Academy. The probation officer said that he would talk to the Alaska Military Youth Academy recruiter. In the interim, I.J. received a favorable report from his time at McLaughlin.

At the next detention hearing, the probation officer reported that the Alaska Military Youth Academy was unable to accept I.J. for the cycle starting in July 2023, and explained that the Academy generally did not accept youth with a history

of elopement. I.J.'s attorney noted that the Alaska Military Youth Academy had told her that they do not consider applicants until their charges are resolved.

The parties later entered into a plea agreement, in which I.J. admitted to five conduct violations for leaving placements and two conduct violations for drug use. (I.J. had previously admitted to the fourth-degree assault charge and two conduct violations for leaving placements.)

A magistrate judge, acting as a standing master, presided over the change of plea and disposition hearing.[3] (The magistrate judge had also presided over a number of detention hearings with I.J. and was familiar with his case.)

Following I.J.'s adjudication as a delinquent minor, the parties addressed disposition. The State argued that the only remaining option was a (b)(1) order under AS 47.12.120 — *i.e.*, an order that allowed the Department to place I.J. at McLaughlin Youth Center.[4]

I.J.'s juvenile probation officer testified that a (b)(1) order was the only available option for I.J. The probation officer pointed out that various different placements had been tried without success and that the only program from which I.J. had not absconded was Raven's Way because "he had nowhere else to go." According to the probation officer, McLaughlin was the only placement that could provide for I.J.'s "safety, his education, his physical and mental health needs." The probation officer also noted that I.J. would get an opportunity to take a neuropsychological evaluation while at McLaughlin.

Marrera testified at the change of plea/disposition hearing. She testified that she was working to get I.J. a neuropsychological examination and an evaluation for fetal alcohol spectrum disorder. She said that she was willing to help look for a

---

[3]  *See* Alaska Delinq. R. 4(a) (authorizing the presiding judge to appoint a standing master to adjudicate juvenile delinquency cases).

[4]  *See* AS 47.12.120(b)(1); *see also* AS 47.12.990(5).

placement for I.J. through her network of foster parents, and she did not think institutionalizing I.J. would improve the situation.

I.J.'s Office of Children's Services case worker testified, indicating that she had been unable to find any placement for I.J. She reported that the long-term program at Raven's Way had rejected I.J. because of his history of running away. She testified that she did not think that I.J. would do well in a foster home because he runs away. She believed that it was in I.J.'s best interests to stop the cycle of placements and running away.

The guardian ad litem agreed that a (b)(1) order was necessary in I.J.'s case. The guardian ad litem stated that it was "vital" that I.J. receive a neuropsychological evaluation, which I.J. could only receive if his team knew where he was. The guardian ad litem noted that I.J. "does well with support. He's done phenomenal[ly] in detention the last few months. . . . [U]nfortunately, when he's not in a place that has extensive twenty-four-seven support for him, he has done poorly." The guardian ad litem did not think that there were any less restrictive alternatives available and thought that a (b)(1) order was in I.J.'s best interests "to keep him safe from himself, to get the services and support he needs."

I.J.'s attorney disagreed that a (b)(1) order was appropriate. The attorney pointed out that the case began with a fourth-degree assault and that I.J. had already served more time than an adult who committed that same crime would serve. The attorney argued that the team had not tried other solutions like ankle monitoring, medications, outdoor-based programs, intensive work programs, or involving his tribal community. However, the attorney did not name any specific program that was available to take I.J. The attorney nevertheless argued that institutionalization was not the answer.

I.J. also addressed the court and explained why he did not want to be institutionalized.

The magistrate judge ultimately concluded that there were no other options remaining other than a (b)(1) order. She found that I.J. had been offered multiple opportunities "to get out of detention, to go back to foster care, or to go to a less restrictive treatment program" but that he had squandered each opportunity. She agreed that a neuropsychological evaluation was needed and that one had not been scheduled because I.J. never stayed anywhere for long enough. She noted that there was an element of public safety in her decision because the public was put at risk by runaway minors who are using drugs and alcohol. She explained that she did not consider I.J. to be a violent offender, but she was nevertheless ordering institutionalization because all the other options had been tried unsuccessfully. She noted her belief that I.J. would succeed at McLaughlin and could potentially be released early.[5]

The assigned superior court judge adopted the recommendation and issued a (b)(1) order committing I.J. to the Department's custody for a period "not to exceed two years."

This appeal followed.

*Standard of review*

On appeal, the parties appear to disagree as to the appropriate standard of review. The guardian ad litem asserts that we review the superior court's disposition under the "substantial evidence" test, citing to the seminal juvenile delinquency case *B.F.L. v. State*, which clearly uses that standard of review.[6] "Under the 'substantial evidence' test, we must uphold the superior court's decision 'if the record contains

---

[5]  *See* AS 47.12.120(b)(1).

[6]  *B.F.L. v. State*, 233 P.3d 1118, 1124 (Alaska App. 2010).

evidence that a reasonable mind might accept as adequate to support the challenged conclusion.'"[7]

However, I.J. and the State both cite to an older case, *Matter of J.H.*, for the proposition that whether the trial court's disposition is the least restrictive alternative is "a question of law" that is reviewed *de novo*. [8]

The apparent confusion over the appropriate standard of review is best explained by turning to Alaska Supreme Court cases that use substantial evidence review in other contexts. For example, in *Espindola v. Peter Pan Seafoods, Inc.*, a worker's compensation case, the supreme court described its substantial evidence review of the Alaska Worker's Compensation Appeals Commission decision as follows:

> We review de novo the Commission's legal conclusion that substantial evidence supports the Board's factual findings by "independently reviewing the record and the Board's findings." "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." "Whether the quantum of evidence is

---

[7] *Id.* (quoting *Y.J. v. State*, 130 P.3d 954, 957 (Alaska App. 2006)).

[8] *See Matter of J.H.*, 758 P.2d 1287, 1291 (Alaska App. 1988) ("[T]he ultimate determination of whether a particular disposition constitutes the least restrictive alternative is a question of law, and not one of fact."), *superseded on other grounds by statute as stated in B.F.L.*, 233 P.3d at 1122-24.

We note that *J.H.* was issued in 1988, prior to the enactment of AS 47.12.140 in 1996. *See* SLA 1996, ch. 59, § 46. Prior to 1996, relying on common law principles, we treated rehabilitation as the "paramount" goal of the juvenile justice system. *See, e.g.*, *R.P. v. State*, 718 P.2d 168, 169 n.1 (Alaska App. 1986), *superseded on other grounds by statute as stated in B.F.L.*, 233 P.3d at 1122-24. But when the legislature enacted AS 47.12.140, it made clear that "there are *two* primary goals when choosing the proper disposition in a delinquency proceeding: the rehabilitative needs of the juvenile and the protection of the community." *B.F.L.*, 233 P.3d at 1124. Thus, as we explained in *B.F.L.*, the underlying premise of *J.H.* and some of our earlier cases — "the premise that, in delinquency proceedings, the goal of rehabilitation is more important than any other goal — is no longer true." *Id.*

substantial is a question of law." "Whether the [B]oard made sufficient findings is a question of law that we review de novo."[9]

Likewise, in *Gottstein v. State, Department of Natural Resources*, the supreme court explained that "[w]e will affirm an agency's factual findings if supported by substantial evidence, but what constitutes substantial evidence presents a question of law requiring de novo review."[10]

In the juvenile delinquency context, the law is clear that "the superior court can authorize a detention placement whenever the State presents substantial evidence that lesser measures will likely fail to meet the twin goals of disposition specified in AS 47.12.140(2) and Delinquency Rule 11(e)."[11]

Thus, in *J.H.*, we vacated the superior court's detention order because we concluded that "the superior court's finding that institutionalization of J.H. was required as the least restrictive alternative is not supported by any substantial evidence in the record."[12] In contrast, in *G.A.D. v. State*, we affirmed the superior court's detention order because we concluded that "[t]he record contains substantial evidence supporting [the judge's] decision to commit G.A.D. to the McLaughlin Youth Center as the least restrictive alternative consistent with G.A.D.'s rehabilitation and protection of the

---

[9]  *Espindola v. Peter Pan Seafoods, Inc.*, 486 P.3d 1116, 1121 (Alaska 2021) (citations omitted); *see also Vue v. Walmart Assocs., Inc.*, 475 P.3d 270, 279 (Alaska 2020) ("We review de novo the Commission's legal conclusion that substantial evidence supports the Board's factual findings by 'independently reviewing the record and the Board's findings.' . . . 'Whether the quantum of evidence is substantial is a question of law.'" (quoting *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014))).

[10]  *Gottstein v. State, Dep't of Nat. Res.*, 223 P.3d 609, 620 (Alaska 2010) (citations omitted).

[11]  *B.F.L.*, 233 P.3d at 1124 (first citing *G.A.D. v. State*, 865 P.2d 100, 102 (Alaska App. 1993); then citing *J.H.*, 758 P.2d at 1291-93).

[12]  *J.H.*, 758 P.2d at 1293.

public."[13] Likewise, in *B.F.L.*, we affirmed the superior court's detention order because the record "provides substantial support for the superior court's conclusion that a 'detention' disposition — *i.e.*, a disposition under subsection (b)(1) of the statute — is the least restrictive alternative available."[14]

We recognize that we have not always been consistent in describing our standard of review in juvenile delinquency cases.[15] We therefore take this opportunity to clarify that we will affirm the superior court's conclusion that a (b)(1) disposition is the least restrictive alternative if the conclusion is supported by substantial evidence, although what constitutes "substantial evidence" in this context is a question of law that we review *de novo* using our independent judgment.[16]

---

[13] *G.A.D.*, 865 P.2d at 104.

[14] *B.F.L.*, 233 P.3d at 1125 (concluding that the magistrate judge and the superior court judge "could reasonably conclude that a disposition order under subsection (b)(1) was the least restrictive alternative that would satisfy the twin goals of rehabilitation and protection of the community").

[15] *See, e.g.*, *R.N. v. State*, 770 P.2d 301, 304 (Alaska App. 1989) ("[W]e are not convinced that the trial court was clearly erroneous in concluding that institutional placement was the least restrictive alternative available to treat R.N.'s delinquency and to protect the community."); *see also C.W. v. State*, 2001 WL 1477925, at *2 (Alaska App. Nov. 21, 2001) (unpublished) (upholding superior court disposition order under an independent review because we agreed with the superior court that "there is good reason to believe a non-custodial placement will not protect the public from [the juvenile], nor will it foster his rehabilitation needs"); *M.P.M. v. State*, 1998 WL 317621, at *3 (Alaska App. June 17, 1998) (unpublished) ("[T]he question of whether the superior court has selected the 'least restrictive' disposition is a question of law, reviewed *de novo* by this court."); *K.V.H. v. State*, 1997 WL 563138, at *2 (Alaska App. Sept. 10, 1997) (unpublished) (referring to disposition as a "question of law" but concluding that the trial court was "not clearly mistaken" in accepting the recommendation of the State).

[16] *Cf. McClain v. State*, 519 P.2d 811, 813-14 (Alaska 1974) (adopting a "clearly mistaken" standard of review for adult criminal sentences which requires the appellate court to independently review the sentencing record but to uphold the sentence if it falls within the permissible range of sentences that a reasonable judge might impose).

Having clarified the standard of review, we now turn to the substantive arguments in this case.

*Why we conclude that substantial evidence supports the trial court's conclusion that a (b)(1) placement is the least restrictive alternative available to I.J.*

As a general matter, there are essentially three types of disposition orders available to a trial court if the court decides to subject the minor to some level of ongoing supervision.[17] The least restrictive disposition is defined in subsection (b)(2) of AS 47.12.120. "Under this subsection, the court places the minor on probation (supervised by the Department), but releases the minor to the custody of parents, guardians, or other suitable persons."[18]

The next level of restriction is defined in subsection (b)(3) of AS 47.12.120. "Under this subsection, the court commits the minor to the custody of the Department, giving the Department the authority to release the minor to the custody of parents or guardians, or to place the minor in a foster home or any suitable *non-detention* residential facility."[19]

The highest level of restriction is defined in subsection (b)(1) of AS 47.12.120. "Under this subsection, the court commits the minor to the custody of the Department, giving the Department the authority to make any placement it deems appropriate — including placement in a detention facility."[20]

---

[17] *B.F.L.*, 233 P.3d at 1119. There is also a fourth option — subsection (b)(4) — if the court orders restitution "in lieu of or in addition to the court's order under (1), (2), or (3) of this subsection." AS 47.12.120(b)(4).

[18] *B.F.L.*, 233 P.3d at 1119; *see also* AS 47.12.120(b)(2).

[19] *B.F.L.*, 233 P.3d at 1119; *see also* AS 47.12.120(b)(3).

[20] *B.F.L.*, 233 P.3d at 1119; *see also* AS 47.12.120(b)(1).

When determining the appropriate disposition for a juvenile who has been adjudicated a delinquent minor, AS 47.12.140 requires the court to consider "the best interests of the minor" and "the interests of the public" and to order "the least restrictive alternative disposition." The "least restrictive alternative disposition" is defined statutorily as the "disposition that is no more restrictive than is, in the judgment of the court, most conducive to the minor's rehabilitation taking into consideration the interests of the public."[21] Alaska Delinquency Rule 11(e) provides that the State bears the burden of proving, by a preponderance of the evidence, that the disposition is the "least restrictive alternative appropriate to the needs of the juvenile and the protection of the community."[22]

Alaska Statute 47.12.140 outlines the factors that the trial court shall consider when deciding the appropriate level of disposition. These factors include:

> (A) the seriousness of the minor's delinquent act and the attitude of the minor and the minor's parents toward that act;
>
> (B) the minor's culpability as indicated by the circumstances of the particular case;
>
> (C) the age of the minor;
>
> (D) the minor's prior criminal or juvenile record and the success or failure of any previous orders, dispositions, or placements imposed on the minor;
>
> (E) the effect of the dispositional order to be imposed in deterring the minor from committing other delinquent acts;
>
> (F) the need to commit the minor to the department's custody or to detain the minor in a juvenile treatment facility, juvenile detention facility, secure residential psychiatric treatment center, or other suitable place in order to prevent further harm to the public;

---

[21] AS 47.12.140(2).

[22] Alaska Delinq. R. 11(e).

(G) the interest of the public in securing the minor's rehabilitation; and

(H) the ability of the state to take custody of and to care for the minor.[23]

In the current case, the trial court imposed a (b)(1) order because it found that all the available less restrictive placements had been tried and failed. We have previously recognized that "[a] minor's history of failed placements and continued violations of the law can justify the superior court's decision to institutionalize the minor."[24]

On appeal, I.J. takes issue with the magistrate judge's conclusion that all viable less restrictive placements had been tried, and he asserts that his attorney proposed some alternatives that could have been explored more. It is true that I.J.'s attorney argued that the court should consider an alternative to institutionalization, and she named various possibilities including another adventure-based educational program, an intensive work program, or a program with tribal involvement. But she did not identify any actual program that would accept I.J. given his significant history of running away.

In any case, the law is clear that "the least restrictive alternative" rule "does not require that a child be allowed to fail at each [successively more restrictive] level of placement before placement in the next restrictive level may be made."[25] Rather, the court can institutionalize a minor if the State presents substantial evidence

---

[23]  AS 47.12.140(1).

[24]  *G.A.D. v. State*, 865 P.2d 100, 102 (Alaska App. 1993) (citing *P.R.J. v. State*, 787 P.2d 123, 124-25 (Alaska App. 1990)).

[25]  *Id.* (quoting *Matter of J.H.*, 758 P.2d 1287, 1291 (Alaska App. 1988), *superseded on other grounds by statute as stated in B.F.L.*, 233 P.3d at 1122-24).

that lesser measures will likely fail to meet the twin goals of rehabilitation and protection of the public.[26]

Here, the record supports the magistrate judge's conclusion that all of the less restrictive options had been tried. I.J. faults the magistrate judge for failing to mention that he had successfully completed the Raven's Way adventure program. But, as both his probation officer and the OCS case worker noted, given the Raven's Way program was located on an island, I.J. "did not have anywhere to run to."

Moreover, while I.J. successfully completed the Raven's Way program, he was unsuccessful in the stepdown outpatient program with Volunteers of America that was intended to be the follow up to the Raven's Way program. And he ran away from the ARCH residential treatment program that was recommended when the Volunteers of America outpatient program failed. Notably, his OCS case worker looked into whether Raven's Way would be willing to accept I.J. in their longer-term residential program, but they denied him placement due to his history of running away, and they instead recommended a lockdown program.

I.J. also argues that a (b)(1) order was inappropriate because his original crime was only a fourth-degree assault, a misdemeanor. And he asserts that the primary problem with his placements was his running away, not continued criminal behavior. Relying on the magistrate judge's finding that he was "not overall what [one] would call a violent offender," I.J. argues that the State failed to prove that institutionalization was required for public safety.

But, as the guardian ad litem emphasized in his disposition remarks, everyone involved in the case recognized that I.J. was not the typical juvenile offender that has to be institutionalized "not just for their own safety but for the safety of the community." Instead, it was I.J.'s own safety and well-being that everyone was worried about. The record shows that I.J. put himself in vulnerable situations when he ran away

---

[26] *Id.*

from his placements, and that he continued to engage in risky and criminal behavior — namely, taking drugs and alcohol — after he ran away from his placements.

In contrast, I.J. did extremely well during the times he was temporarily detained at McLaughlin. As the guardian ad litem pointed out, I.J. had done "phenomenal[ly]" at McLaughlin in the last few months before the disposition hearing. But he continued to do "poorly" whenever he was in a placement that did not have "twenty-four-seven support for him." The record also establishes that there were services that I.J. desperately needed — including a neuropsychological evaluation — that he would be able to get at McLaughlin but that he had been unable to get at any other placement because of his constant running away.

Lastly, I.J. argues that a (b)(1) order for the next two years was so disproportionate to the underlying crime of fourth-degree assault as to constitute "cruel and unusual punishment" in violation of the state and federal constitutions.[27] He points out that the maximum penalty for an adult convicted of fourth-degree assault would be a year in prison,[28] and he asserts that the (b)(1) order in this case could result in his detention "for a period twice as long as an adult sentenced for the same underlying conduct."

We have previously rejected such constitutional arguments in the juvenile delinquency context because of the differences between the adult criminal system and the juvenile justice system. In *M.O.W. v. State*, for example, the minor was found to be in possession of a small amount of marijuana.[29] The minor argued that being subjected to possible detention as a minor for conduct that would not be a crime for an adult, or if a crime would only be penalized by a fine, amounted to an unconstitutional denial of

---

[27] U.S. Const. amend. VIII; Alaska Const. art. I, § 12.

[28] *See* AS 12.55.135(a).

[29] *M.O.W. v. State*, 645 P.2d 1229, 1230 (Alaska App. 1982).

the equal protection of the laws and would subject the minor to "cruel and unusual punishment."[30] We rejected these contentions as "totally without merit,"[31] citing to Alaska Supreme Court cases that recognized that the "distinct government interests with reference to children may justify legislation that could not properly be applied to adults."[32]

We likewise find no merit to I.J.'s claim that *Miller v. Alabama* dictates a different result in this case.[33] *Miller* addresses the constitutionality of life sentences for juveniles who have been waived out of the juvenile justice system and into adult criminal court.[34] At its heart, *Miller* is about how children are fundamentally different than adults and why they therefore warrant different treatment than adults, even when they are waived into the adult criminal system.[35] In contrast to the minor defendants in *Miller*, I.J. is in a juvenile justice system specifically designed to address the unique attributes of minors and their needs. His disparate treatment from an adult who is convicted of fourth-degree assault is grounded in the recognized differences between children and adults and does not raise any constitutional concerns.

---

[30] *Id.* at 1231 n.4.

[31] *Id.*

[32] *L.A.M. v. State*, 547 P.2d 827, 834 (Alaska 1976); *see also Anderson v. State*, 562 P.2d 351, 358 (Alaska 1977); *A.K. v. State*, 2001 WL 864193, at *2 (Alaska App. Aug. 1, 2001) (unpublished) (finding no equal protection violation when the length of time that the minor could be under state custody would exceed the maximum sentence that a court could give to an adult offender convicted of the same offense because "[t]here is substantial authority for treating juvenile offenders differently than adult offenders").

[33] *Miller v. Alabama*, 567 U.S. 460 (2012).

[34] *Id.* at 479 ("We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders.").

[35] *Id.* at 471.

Although we find no merit to I.J.'s cruel and unusual punishment argument, we do have some concerns about the length of the disposition order in this case. The superior court ordered the (b)(1) placement for a period of time "not to exceed two years" but there was no actual discussion of why that length of time was appropriate. Indeed, the magistrate judge was clear that she did not think I.J. would be at McLaughlin for the full two years, and that he would likely be released before then.

Alaska Statute 47.12.260 governs the early release of minors who have been committed to the custody of the Department. It provides:

> A minor found to be a juvenile delinquent who by conduct gives sufficient evidence of having reformed may be released at any time under the conditions and regulations that the department considers proper, if it appears to the satisfaction of the department that there is a reasonable probability that the minor will remain at liberty without violating the law.[36]

The magistrate judge referenced this provision in her disposition comments. She also made clear that she would be monitoring I.J.'s progress on a yearly basis and that his lawyer or his guardian ad litem could ask for an earlier hearing based on his progress. The magistrate judge extended the appointments of I.J.'s attorney and his guardian ad litem to ensure that they would be in a position to request a hearing for early release. The guardian ad litem indicated that, like the court, he did not think that I.J. would be at McLaughlin for two years.

Given the procedures that are already in place to monitor I.J.'s progress and the court's express willingness to consider an early release, we conclude that a remand for reconsideration of the length of the order is not necessary. But we remind

---

[36] AS 47.12.260; *see also* AS 47.12.120(b)(1) (providing that "the minor may be released from placement or detention and placed on probation on order of the court and may also be released by the department, in its discretion, under AS 47.12.260").

trial courts that they should carefully consider the appropriate length of a disposition order and provide an explanation on the record for why that time period was ordered.

*Conclusion*

The judgment of the superior court is AFFIRMED.